# FAIRFAX HOSPITAL SYSTEM, INC.

v.

# JANET PLATT MCCARTY, ET AL.

Record No. 911203

June 5, 1992

Present: All the Justices

*William D. Cremins (Gerald R. Walsh; Robert F. Donnelly, Jr.; Walsh & Cremins*, on briefs), for appellant.
*William O. Snead, III; Mark A. Towery (Judith G. Ising*, on brief), for appellees.

JUSTICE COMPTON delivered the opinion of the Court.

This is an appeal in a medical malpractice action brought against a hospital based on the alleged negligent failure of a labor and delivery nurse to notify promptly the attending physician of the deteriorating condition of a fetus.

On June 3, 1987, about 9:00 a.m., appellee Janet Platt McCarty, age 31 and pregnant with her first child, was admitted to Fairfax Hospital, operated by appellant Fairfax Hospital System, Inc. Approximately 12 hours later, appellee Luke McCarty was born permanently impaired, both neurologically and developmentally.

Initially, a Notice of Claim for medical malpractice was filed in October 1988 against Dr. Paul S. Burka and the Hospital for the events leading to the delivery of the baby. Also the Notice asserted a claim against Burka, Dr. Michael A. Ross, and the Hospital for the events culminating in an allegedly unnecessary hysterectomy performed on the mother. Prior to the Medical Malpractice Review Panel Hearing, the mother settled her claim against Ross for $150,000.

Following a hearing, the Medical Malpractice Review Panel found on September 13, 1989 that Burka failed to comply with the appropriate standard of care in the baby's delivery and in the management of the mother's postpartum condition. The Panel also found that there was a material issue of fact, not requiring expert opinion and suitable for consideration by a court, bearing on the liability of the Hospital relating to the baby's birth.

On September 26, 1989, the mother and father (appellee Michael Noone McCarty), individually, and the infant, through his next friend, filed the present action against the Hospital and Burka. In a two-count amended motion for judgment, the plaintiffs sought damages for the injury to the infant, for various physical injuries to the

mother (including postpartum injury), and for the mother's emotional distress relating to the injury to the fetus.

Prior to trial, the claims against Burka were settled. The proposed settlement provided for a structured payment to the infant, the cost of which was not to exceed $500,000, for his claim. Additionally, $200,000 was to be paid the mother for her emotional distress claim, and $600,000 for her hysterectomy claim. In October 1990, after the trial court approved the infant's settlement, the compromises were consummated and the court entered an order dismissing the claims against Burka.

Following the Burka settlements, the mother nonsuited the hysterectomy claim against the Hospital. The case proceeded to trial before a jury on three separate claims against the Hospital: (1) the infant's claim for his *in utero* injuries; (2) the parents' claim for the infant's medical expenses; and (3) the mother's emotional distress claim.

After a 10-day trial held in November 1990, the jury returned verdicts in favor of the infant in the amount of $1,250,000; in favor of the parents in the amount of $1,500,000 for the infant's medical expenses; and in favor of the mother in the amount of $750,000 for her emotional distress claim. Following post-trial motions, the court below reduced the infant's verdict to the amount of the $1 million statutory cap and further reduced the verdict by the $500,000 settlement with Burka. The court also ruled that the parents could not recover for the infant's medical expenses because that amount was subject to the infant's cap which had been exhausted by his recovery. Finally, the mother's verdict was reduced by the amount of her $200,000 settlement with Burka.

Thus, the trial court entered judgment in favor of the infant in the amount of $500,000 and in favor of the mother in the amount of $550,000. We awarded the Hospital this appeal from the April 1991 judgment order.

On appeal, the Hospital's assignments of error present five contentions. (1) The trial court erred in refusing to grant summary judgment for the Hospital when the evidence established that Burka's negligence ''was the immediate, competent producing proximate cause'' of the infant's injuries. (2) The settlements with Ross and Burka consumed the entire applicable statutory cap because the amount stipulated by the settlement agreement exceeded the sum of $1 million. (3) An accord and satisfaction occurred between the McCartys and Burka which operated to release the Hospital from any

liability to the McCartys. (4) The judgment in favor of the mother for her emotional distress "based solely upon the birth of a neurologically impaired child with no physical injury to her is contrary to the law." (5) The trial court erred in refusing to admit in evidence the Medical Malpractice Review Panel opinion adverse to Burka.

First, we shall address the proximate cause issue. The plaintiffs' theory of the case, submitted to the jury in appropriate instructions, was that the negligence of Burka, the attending physician, concurred with that of the Hospital to produce the damages claimed. Specifically, the plaintiffs asserted that the Hospital's labor and delivery nurse violated the standard of care because of her inordinate delay in recognizing fetal distress and in initiating appropriate nursing intervention, including timely notification of the attending physician.

The facts will be summarized in the light most favorable to the plaintiffs, in accord with settled principles of appellate review. Ross, engaged in the practice of obstetrics and gynecology, was the mother's "primary" physician. She was admitted to the Hospital on the day in question after spontaneous rupture of the membranes about 7:30 a.m. Following admission, she was taken to the labor room and Hospital personnel began to monitor electronically the fetal heart rate and maternal contractions.

Burka, an obstetrician-gynecologist who often "covered" for Ross, examined the mother about 2:00 p.m. while Ross was still attending her. Later, Ross asked Burka to assume the mother's full care and Burka examined her about 6:00 p.m. From that time until the birth of the child at 9:17 p.m. Burka was always in the "labor and delivery area" of the Hospital.

Beverly Jean McClure, employed by the Hospital as a labor and delivery nurse, began attending the mother at 6:10 p.m. while she was still in the first stage of labor. The mother was McClure's "responsibility" until 9:00 p.m.

Burka next examined the mother about 7:10 p.m. and determined that she "had made excellent progress . . . in the active phase of labor." The second phase of labor began at 8:10 p.m. and lasted until the 9:17 p.m. delivery. The significant events in this case occurred during this 67-minute period.

Burka was in the labor room "many times" between 8:10 p.m. and 8:25 p.m. He was not in the labor room, but in a nearby physician's lounge, from 8:25 p.m. until near 8:58 p.m.

The evidence established that the fetus began experiencing "trouble" about 8:27 p.m. A broad-based deceleration of the fetal

heart rate began to register on the monitor. The mother began abnormal labor about 8:29 p.m. By 8:37 p.m. the "baby" was "sick" and "getting sicker," as indicated by the monitor's fetal heart rate tracings. At this point, according to the plaintiff's expert witness, the applicable standard of care required the nurse to institute certain nursing procedures including "to call for help to get this baby delivered." At that time, according to the witness, the delivery could have taken place in 10-12 minutes if the mother had been "unhooked" from the monitor and moved from the labor room to the delivery room 40 feet away. Burka was unaware of the heart rate fluctuations during this critical period because he was not in the labor room and none of the remote terminals displaying fetal heart-rate tracings for that labor room was "working."

By 8:42 p.m., the fetus had exhausted its oxygen supply and began relying on its "emergency reserve," a four-minute "back-up system" that helps the fetus survive the stress of labor. At 8:46 p.m., damage to the brain began and delivery by 8:51 p.m. was necessary to avoid injury to the baby. At 8:52 p.m., brain damage was occurring and the outside limit for birth of a neurologically normal baby was fixed by the testimony at 8:53 p.m.

McClure "went to get" Burka between 8:50 p.m. and 9:00 p.m.; he may have appeared at the labor room door briefly several minutes before 9:00 p.m. Based upon what McClure told him at the time, Burka understood there had been a decline in the fetal heart rate and that this deceleration "had just happened." According to Burka, who testified as a witness for the plaintiffs, "there was no indication that there was an immediate emergency with the baby from Ms. McClure." Burka testified that if he had been watching the heart-rate tracings, he "would have moved to deliver Mrs. McCarty shortly before 8:40" p.m. Burka based this conclusion upon the fact that during "the previous 10 minutes there had been a dramatic qualitative change in the fetal heart rate tracing from what had previously transpired'; there were "progressively longer, deeper, more widely based heart rate decelerations with maternal contractions and pushing efforts." Burka first realized "the baby was in trouble" shortly after 9:00 p.m., when the mother had been transferred to the delivery room.

Upon birth at 9:17 p.m., the infant "was very neurologically impaired." The evidence established that the cause of this condition at delivery was a "prolonged episode of relatively severe hypoxia or

lack of oxygen'' which had ''gone on'' from 8:40 p.m. until delivery. According to the evidence, the fetus, which was otherwise normal and healthy, did not receive enough oxygen or nutrition because of ''placental separation and abruption of the placenta which took away his oxygen supply in part and his ability to be nourished by his mother in part for a period of time before birth.''

The evidence established that McClure either failed to observe or to recognize the signs of fetal distress during the period between 8:30 p.m. and near 9:00 p.m., when she summoned Burka. Indeed, the evidence showed that the nurse left the labor room at 8:40 p.m. and was absent for about 10 minutes when, according to the testimony, she should have been engaged in ''one-on-one nursing'' continuously. A plaintiffs' expert testified that McClure's failure to ''take action or notify the physician delayed delivery and consequently contributed in a causative manner to the eventual outcome for this infant.''

We reject the Hospital's contention that the plaintiffs failed as a matter of law to establish that McClure's negligence was a proximate cause of the injuries and damages sustained. The Hospital relies upon a version of the facts more favorable to it which would establish that Burka was alerted shortly before 8:46 p.m. The Hospital contends that any negligent conduct of McClure prior to 8:50 p.m. was a remote cause of the plaintiffs' damages, not a proximate cause, because there was testimony a 60-second delivery in the labor room could have been accomplished prior to the onset of permanent brain damage. The Hospital argues that the ''intervening and independent'' conduct of Burka was the ''immediate cause of the injury.''

The weakness of the Hospital's present argument is demonstrated by the fact that it has taken inconsistent positions on the subject. At trial, the Hospital withdrew its proffered instruction on the concept of intervening, independent cause; now, on appeal that argument has been resurrected.

More importantly, however, the mere recital of the facts in the light most favorable to the plaintiffs shows there was abundant, credible evidence, which the jury was entitled to accept, establishing that McClure's breach of the standard of care was a proximate cause of the injuries and damages sustained; no further analysis of the evidence is necessary. It is sufficient to state that a jury issue was presented on the question whether McClure's delay in recognizing and reacting to fetal distress, and in performing appropriate

nursing intervention, including timely notice to the attending physician, were substantial breaches of the standard of care. It was for the jury to say whether these breaches by the Hospital's employee constituted an efficient cause of the losses suffered by the plaintiffs. Thus, we hold that the trial court correctly refused to enter summary judgment in favor of the Hospital.

Next, we shall address the Hospital's contention that the "pretrial settlements by the McCartys with two joint tortfeasors," Ross and Burka, "consumed the entire statutory cap applicable to this case because the amount stipulated by the agreement pursuant to § 8.01-35.1 exceeded the sum of one million dollars," and there should be no recovery by the infant. The Hospital argues that it is due a credit against the infant's recovery for the amount of the $150,000 Ross settlement and for the undisclosed sum of payments to be made in the future in the structured settlement with Burka. According to the Hospital, noting that the infant's life expectancy is from 30 to 60 years, the payments ultimately to be made to him pursuant to the settlement agreement will total between $1.2 and $2.2 million. The Hospital says, "Payment of the lower figure is absolutely guaranteed by the Agreement and the higher figure is that which will be paid on Luke's behalf if he lives to age 60." Thus, the Hospital contends, the trial court "was obligated to credit at least [$1.2 million], which would have reduced the permissible recovery against Fairfax Hospital to zero." We do not agree.

As pertinent, Code § 8.01-35.1 provides:

"A. When a release or a covenant not to sue is given in good faith to one of two or more persons liable in tort for the same injury, . . . :

1. It shall not discharge any of the other tort-feasors from liability for the injury, . . . unless its terms so provide; but any amount recovered against the other tort-feasors or any one of them shall be reduced by any amount stipulated by the covenant or the release, or in the amount of the consideration paid for it, whichever is the greater."

In the first place, the settlement with Ross was for an injury solely to the mother and the infant received no consideration for that settlement. Ross was not involved in the events which caused the

infant's injuries, and the infant made no claim against Ross. Claim was made against Ross, along with Burka, for the involvement of Ross in the events culminating in the mother's hysterectomy, which was performed several hours after the child's birth. The pre-natal injury to the infant and the post-natal injury to the mother were separate incidents and separate claims. Thus, Ross was not liable for "the same injury," in the language of the statute. And, the fact relied on by the Hospital that Ross demanded and obtained releases from all the McCartys does not change this result.

█ In the second place, the trial court did not err in utilizing the present value of the infant's structured settlement with Burka in reducing the infant's verdict against the Hospital. Under Code § 8.01-35.1, the Hospital is not entitled to a credit equal to the undiscounted sum of payments which the settlement agreement provides for the infant.

Significantly, the second sentence of subparagraph (1) of § 8.01-35.1(A) provides:

> "In determining the amount of consideration given for a covenant not to sue or release for a settlement which consists in whole or in part of future payment or payments, the court shall consider expert or other evidence as to the present value of the settlement consisting in whole or in part of future payment or payments."

Focusing only on the first sentence of subparagraph (1), the Hospital argues that because the amount of the future payments is "stipulated" in the release given on behalf of the infant to Burka and because the amount of the guaranteed payments thus "stipulated" exceeds the stated "consideration" of $500,000, and exceeds the $1 million statutory cap, no recovery can be had against it. This contention completely disregards the second sentence of subparagraph (1).

█ That sentence expressly contemplates a case like this where a joint tort-feasor obtains a release based upon payments to be made in the future. The sentence provides that the "present value" of a structured settlement shall be the basis for reduction of a subsequent verdict or judgment obtained against a non-settling joint tort-feasor. We agree with the trial court that it would have been unnecessary for the General Assembly to have provided how to compute consideration in a future-payment settlement unless it intended for that figure to be used to reduce a verdict or judgment against another tort-

feasor. Consequently, the trial court was justified in finding "the present value" of the settlement to have been $500,000, and in reducing the infant's verdict in that amount only.*

■ The final three issues require no extended discussion. We reject the Hospital's contention that the McCartys settled with Burka upon an agreement for an oral release, and that an accord and satisfaction resulted which operated to release the Hospital from all claims. The consummated settlement was preceded by an agreement in principle memorialized by an exchange of letters setting forth the parties' understanding and was expressly conditioned on approval of the infant settlement by the trial court. Burka was released from liability to the McCartys only after execution of a written settlement agreement and release on October 4, 1990 and final approval of the infant's claim by the trial court in an order entered October 25, 1990. The release was given in accordance with § 8.01-35.1, no accord and satisfaction occurred, and the Hospital was not thereby released.

■ Likewise, we reject the Hospital's contention that the mother was not entitled to recover for her emotional distress resulting from the injuries to the fetus. The Hospital ignores our recent rulings on this issue. In *Bulala* v. *Boyd*, 239 Va. 218, 389 S.E.2d 670 (1990), we held that a mother who had given birth to an impaired child would be entitled to recover, as a part of her individual claim, for mental suffering resulting from the birth of the defective child. *Id.* at 229, 389 S.E.2d at 675. This was based on our decision in *Modaber* v. *Kelley*, 232 Va. 60, 348 S.E.2d 233 (1986), that an injury to a fetus constitutes injury to the mother because an unborn child is a part of the mother until birth. *Id.* at 66, 348 S.E.2d at 236-37. Additionally, because the mother was a "patient," within the meaning of Code § 8.01-581.15 placing a cap on the total amount recoverable for any injury to "a patient," she was "entitled to the benefit of one statutory cap for her compensatory damage claim." *Bulala*, 239 Va. at 229, 389 S.E.2d at 675. Consequently, the trial court did not err in entering judgment for the mother on her emotional distress claim.

■ In conclusion, we find the trial court correctly refused to admit as evidence the Medical Malpractice Review Panel opinion adverse to Burka. The Hospital's entire argument on this issue

---

* We do not reach the Hospital's contention that there was no evidence of the "present value" of the infant's settlement. This contention was not the subject of an assignment of error. "Only errors assigned . . . will be noticed by this Court." Rule 5:17(c).

amounts to a recital of that portion of Code § 8.01-581.8 which provides that a Panel Opinion "shall be admissible as evidence in any action subsequently brought by the claimant in a court of law." But this statute contemplates that a panel opinion relating to a health care provider who is a party to the litigation be admitted in evidence. Here, by the time of trial, Burka was no longer a party defendant.

Accordingly, the judgment of the trial court will be

*Affirmed.*