Present:  Hassell, C.J., Lacy, Keenan, Kinser, Lemons,
          and Agee, JJ., and Russell, S.J.

ROBERT L. CASTLE, M.D., ET AL.

v.  Record No. 052679  OPINION BY JUSTICE CYNTHIA D. KINSER
                                    November 3, 2006
KARYN LESTER

            FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                  Gaylord L. Finch, Jr., Judge


     In this medical-malpractice claim by a mother for

injuries arising from the birth of her neurologically

impaired child, the defendant-doctor asks the Court to

reconsider its holding in Bulala v. Boyd, 239 Va. 218, 389

S.E.2d 670 (1990).  We find no reason to overrule that

decision and therefore conclude that the trial court did

not err in instructing the jury "that injury to an unborn

child in the womb of the mother is to be considered as

physical injury to the mother."  We also conclude that the

trial court did not err in admitting evidence relevant to

the mother's claim for damages for mental suffering due to

the birth of her impaired son, including evidence regarding

the nature and extent of the child's injuries, his daily

care needs, and his life expectancy, as well as evidence

about the mother's depression and loss of income.  Finally,

we conclude the trial court did not abuse its discretion

when it denied the doctor's motion for a mistrial after the

mother testified that the doctor left the hospital during her labor.  Thus, we will affirm the judgment of the circuit court.

## I.  RELEVANT FACTS AND PROCEEDINGS[1]

Karyn Lester (Lester), and Dusty L. Lester, Jr., by his parent and next friend Karyn Lester (Dusty), filed a motion for judgment in the Circuit Court of Fairfax County, alleging that the appellants, Dr. Robert L. Castle, M.D., and his professional corporation, Fairfax OB-GYN Associates, P.C. (collectively, Dr. Castle), were liable for injuries to both Lester and Dusty resulting from Dr. Castle's negligence in monitoring and managing Lester's labor and effecting Dusty's delivery.  Dusty's alleged damages included severe neurological and physical injuries, pain and suffering, mental anguish, future medical expenses, and lost income.  Lester alleged that, as a result of Dr. Castle's negligence, she suffered, inter alia, physical injuries, mental anguish, and lost income.

Prior to trial, Dr. Castle settled Dusty's claims.  He subsequently admitted liability with regard to Lester's

---

[1]  We will recite here those facts and proceedings pertinent to our consideration of Dr. Castle's first two assignments of error.  The facts relevant to his third assignment of error appear in Part II.B. of the opinion.

claims against him.  Thus, the litigation continued only with respect to the amount, if any, of Lester's damages.[2]

In light of the settlement of Dusty's case, Dr. Castle filed a motion in limine, seeking to exclude any reference to Dusty's injuries, damages, life expectancy, and costs of medical treatment.  Dr. Castle asserted that admitting such evidence would be unfairly prejudicial, would confuse the jury, and would permit Lester to litigate claims already settled, thereby opening the door to an improper, double recovery.  Lester agreed to exclude evidence of Dusty's medical expenses, conceding that those damages were included in Dr. Castle's settlement with her son, but she opposed the exclusion of evidence concerning the extent of Dusty's injuries and his diminished life expectancy.  The trial court agreed with Lester, denying Dr. Castle's motion in limine with respect to evidence about Dusty's injuries and life expectancy and granting it with respect to the costs of treating and raising a neurologically impaired child.

At trial, Lester offered into evidence the videotaped, de bene esse deposition of Dr. Shlomo Shinnar, an expert in

---

[2]  The trial court instructed the jury that Dr. Castle had admitted liability for any injuries Lester "received from her labor and delivery" and that the only issue for

3

the field of pediatric neurology.  Dr. Castle had previously objected to Dr. Shinnar's testimony, claiming that, while it would be appropriate for a jury to understand that Dusty was born severely neurologically compromised, the details of Dusty's condition since birth, as well as Dr. Shinnar's opinions about Dusty's current neurological and physical condition and life expectancy, were not relevant to the issue of damages sustained personally by Lester.  Dr. Castle asserted that such evidence would lead to a double recovery for Dusty's injuries.  The trial court overruled Dr. Castle's objection and allowed Dr. Shinnar's videotaped deposition to be admitted into evidence and viewed by the jury.

After explaining the records he had reviewed and his examination of Dusty, Dr. Shinnar described Dusty's physical and neurological problems and the kind of care Lester must provide on a daily basis to her son.  He testified that Dusty is unable to swallow, thus requiring him to be nourished by means of a permanent gastrostomy tube that delivers food directly into Dusty's stomach.  The tube is necessary, according to Dr. Shinnar, because Dusty's neurological condition has damaged the muscles that

the jury to decide was the amount of damages, if any,
Lester was entitled to recover.

allow a healthy infant's food to pass into the stomach instead of the lungs and that ordinarily cause a person to cough up food that he or she accidentally inhales. Dusty is also at risk for aspirating his saliva because of his difficulty in swallowing. Dr. Shinnar described the treatment Lester administers to Dusty to keep his lungs clear of secretions and saliva, which includes using a suctioning device eight to ten times, on a good day, while he is awake and several times during the night, and performing chest physical therapy six to seven times per day. The physical therapy requires Lester to pound lightly on Dusty's chest in order to move secretions up out of his lungs.

Dr. Shinnar also discussed the impact of Dusty's condition on his ability to breathe. Because of Dusty's frequent episodes of pneumonia and aspirations of saliva and other secretions, he already has lung disease. Consequently, Dusty receives oxygen via prongs continuously attached to his nose. According to Dr. Shinnar, without oxygen supplementation, the saturation of oxygen in Dusty's bloodstream would fall so low as to cause him to have trouble breathing and to gasp for air.

With respect to Dusty's motor functioning, Dr. Shinnar testified that Dusty will never be able to walk or sit up

independently, and that Lester provides physical therapy to Dusty several times each day, during which she moves Dusty's joints for him in order to prevent them from permanently contracting into fixed positions. As to Dusty's development, Dr. Shinnar stated that, as a result of Dusty's neurological abnormalities, Dusty is developing a mild curvature of his spine, that the growth of his head is stunted, that he is deaf, that he will never be able to communicate beyond the vocalizations of a newborn, that he will never be able to recognize his mother's voice or visual appearance, that he will never attain the level of functioning of a six-month-old child, and that he likely will never attain the functional level of even a three-month-old child.

In summary, Dr. Shinnar opined that Dusty is and will remain totally dependent for all his care needs and that he actually is more dependent than a newborn baby because a healthy newborn can usually breathe independently. Finally, Dr. Shinnar testified that Dusty's life expectancy is approximately seven years of age.

Lester testified on her own behalf at trial. A considerable portion of her testimony consisted of a video slide presentation, during which she described the tasks she performs on a daily basis to care for Dusty. Lester

6

explained how she administers chest physical therapy and nebulizer treatments for 15 to 25 minutes about every four hours in order to keep Dusty's airway clear of saliva and secretions. In addition, she performs suction treatments on Dusty at least ten times daily. Some of the suctioning consists of "deep suction" treatments, which involve placing a tube in the back of Dusty's throat and causing him to gag in order to suck secretions from his airway. Every three to four hours, according to Lester, she feeds Dusty for 20 to 30 minutes by pouring milk through a feeding tube that is connected to a valve surgically implanted in Dusty's abdomen. She also testified that Dusty requires several medications every day, which she administers at intervals ranging from eight to 12 hours. Lester explained that she must take along Dusty's suctioning machine and oxygen supply whenever she transports him outside the home because he can never be without the equipment.

Lester also described the impact giving birth to Dusty and caring for him has had on her personal health. She claimed to have sustained hemorrhaging as a result of the delivery. Her constant care of Dusty since his birth allows her to sleep only in increments of about 30 minutes. Lester claimed not to have slept continuously for eight

hours since before Dusty's birth, and because of his breathing difficulties, she must sleep in Dusty's room.

With respect to her mental health, Lester testified that, because caring for Dusty consumes all of her time, she is "not ever happy," and that she routinely takes prescription antidepressant medication. Although Lester initially returned to work after Dusty's birth, she said she eventually took a leave of absence after being diagnosed with depression.

In poignant detail, Lester described how she feels about her son and caring for him:

> Sometimes he smiles, and that lights my life up. That's the greatest thing in the whole wide world to me now if he'll smile. But he doesn't do that every day. Sometimes he goes days without even looking at me.
>
> Most of the time he looks down to the left, which is part of his cerebral palsy. He doesn't reach out to touch you. He doesn't move his arms and legs. He doesn't suck a bottle. I couldn't breast-feed him. There is no joy in taking care of my son. I love my son to death, but my son is a job. It's . . . it's constant. It's . . . I don't know how to describe what it feels like to pour feed into somebody.
>
> You know, eating is one of the normal pleasures of life. People celebrate with food. It's part of your life. He doesn't even have that. He doesn't even get to eat. And I have to pour food into him to keep him alive. It's what I do. I keep him alive, and I pray constantly that God is going to heal this child because he doesn't have a life, and I don't have a life anymore. My life is keeping him alive. And

there's no joy in it.  The only joy that I get is on the occasion when he smiles.

Lester's testimony also described the series of events and tests whereby she came to understand the extent of Dusty's neurological impairments.  She related that she was not permitted to touch Dusty for several weeks after he was born because he had to remain in a neonatal intensive care unit.  During the weeks and months after Dusty's birth, Lester learned that her son would never be able to eat and that he needed to have surgery that would permanently secure a feeding tube to his abdomen and tie the top of his stomach together so as to prevent him from vomiting.  Through observation of tests performed on Dusty, Lester learned that he is blind and deaf.  When Dusty was about four to five months old, a pediatric developmental therapist informed Lester that Dusty would never walk or talk.

As pertinent to the issues on appeal, the trial court gave, over Dr. Castle's objection, Instruction No. 6, which told the jury "that injury to an unborn child in the womb of the mother is to be considered as physical injury to the mother."  Dr. Castle asserted that Instruction No. 6 was not appropriate since this case involved a live birth, as opposed to a stillbirth, and that it would allow Lester to

recover for the same physical injuries for which Dusty had already been compensated.

The trial court also gave Instruction No. 5, which stated:

> If you find your verdict for the plaintiff, then in determining the damages to which she is entitled, you shall consider any of the following which you believe by the greater weight of the evidence was caused by the negligence of the defendants:
>
> > (1) any bodily injuries she sustained and their effect on her health according to their degree;
> >
> > (2) any mental anguish she suffered in the past and any that she may be reasonably expected to suffer in the future;
> >
> > (3) any associated humiliation or embarrassment;
> >
> > (4) any inconvenience caused in the past and any that probably will be caused in the future;
> >
> > (5) any earnings she lost because she was unable to work at her calling.
>
> Your verdict should be for such sum as will fully and fairly compensate the plaintiff for the damages sustained as a result of the defendant's negligence.

The jury returned a verdict awarding Lester $1.6 million in damages. The trial court entered judgment for Lester in accordance with the jury verdict. Dr. Castle appeals from that judgment.

## II.  ANALYSIS

### A.  Mother's Injuries Arising from the Birth of an Impaired Child

In this appeal, we once again address two previous rulings of this Court, that an injury to a fetus constitutes an injury to the mother, Modaber v. Kelley, 232 Va. 60, 66, 348 S.E.2d 233, 237 (1986); and that a mother who gives birth to an impaired child is entitled to recover, as part of her individual cause of action, damages for her mental suffering resulting from the birth.  Bulala, 239 Va. at 229, 389 S.E.2d at 675; see also Fairfax Hosp. Sys., Inc. v. McCarty, 244 Va. 28, 37, 419 S.E.2d 621, 626-27 (1992).  Dr. Castle asks us to reconsider our holding in Bulala because that decision, he argues, extended "the rule in Modaber beyond its supporting rationale."

Dr. Castle's quarrel with Bulala underpins two of his three assignments of error.  First, he contends the trial court erred in giving Instruction No. 6 to the jury because Dusty was born alive and therefore had his own separate claim for his personal injuries, for which he had already been compensated.  Second, Dr. Castle claims "the trial court erred in allowing . . . jury instructions permitting, and evidence supporting, . . . Lester's claims for damages from mental suffering due to her son's impairment,

11

including evidence regarding her son's life expectancy, condition, and care needs, and [her] depression and lost earnings."

In support of these two assignments of error, Dr. Castle argues the decision in Modaber allowing a mother's claim for physical injury and mental anguish arising from her child's stillbirth was necessary to mitigate the harshness of the common law "rule that an unborn child is a part of the mother until birth and, as such, has no juridical existence." Lawrence v. Craven Tire Co., 210 Va. 138, 142, 169 S.E.2d 440, 442 (1969) (internal quotation omitted). Dr. Castle contends the need to allow a mother to recover such damages disappears when the child is born alive, albeit impaired, and becomes a "person" with legal recourse for his or her own prenatal injuries. Furthermore, according to Dr. Castle, when a child is born alive, continued recognition of his or her prenatal injuries as being those of the mother allows an impermissible double recovery for the same injury, once by the mother, and again by the child. The essence of Dr. Castle's argument is that Lester should have recovered only for her own physical injuries and resulting mental anguish and not for any mental suffering caused by the birth of her severely impaired son and the need for her to provide him

12

with around-the-clock care. Thus, Dr. Castle asks this Court to reconsider our decision in Bulala and to hold that the trial court erred in giving Instruction No. 6 and in admitting evidence concerning the severity of Dusty's impairments, his ongoing care needs, and his life expectancy.

Of course, Dr. Castle's request that we revisit our decision in Bulala implicates the doctrine of stare decisis. Time and again, we have said:

> In Virginia, the doctrine of stare decisis is more than a mere cliché. That doctrine plays a significant role in the orderly administration of justice by assuring consistent, predictable, and balanced application of legal principles. And when a court of last resort has established a precedent, after full deliberation upon the issue by the court, the precedent will not be treated lightly or ignored, in the absence of flagrant error or mistake.

Pulliam v. Coastal Emergency Servs., Inc., 257 Va. 1, 10, 509 S.E.2d 307, 312 (1999) (quoting Selected Risks Ins. Co. v. Dean, 233 Va. 260, 265, 355 S.E.2d 579, 581 (1987)); see also Nunnally v. Artis, 254 Va. 247, 252-53, 492 S.E.2d 126, 128-29 (1997); Kelly v. Trehy, 133 Va. 160, 169, 112 S.E. 757, 760 (1922). We have previously considered the issues presented in this appeal, and we entertain them again today. Nonetheless, we are convinced that our holding in Bulala was not a "flagrant error or mistake,"

13

*Pulliam*, 257 Va. at 10, 509 S.E.2d at 312, but was well reasoned and remains good law.

In *Modaber*, the issue before the Court was whether a mother sustained personal injuries, as well as mental suffering, as a result of the stillbirth of her child. 232 Va. at 61, 348 S.E.2d at 233. A jury found that the defendant-obstetrician's negligence had caused the plaintiff's unborn child to die in the womb. *Id.* at 62, 65, 348 S.E.2d at 234–36. The trial court in that case gave an instruction identical to the one Dr. Castle assigns as error here: "[I]njury to an unborn child in the womb of the mother is to be considered as physical injury to the mother." *Id.* at 65, 348 S.E.2d at 236. We concluded that the instruction was a correct statement of the law and that the mother "may recover for such physical injury and mental suffering associated with a stillbirth." *Id.* at 66, 348 S.E.2d at 236–37. Clearly, the decision in *Modaber* was a logical consequence of our prior holding that, since a fetus is not a legally cognizable "person" separate from its mother until birth, Virginia's wrongful death statute does not allow a cause of action for the death of an unborn child. *Id.* at 66, 348 S.E.2d at 236–37 (citing *Lawrence*, 210 Va. at 140–42, 169 S.E.2d at 441–42).

14

In Bulala, we examined the elements of a mother's compensatory damage claim and that of her child when the defendant-doctor's negligence caused the child, though born alive, to be seriously impaired.  239 Va. at 229–30, 389 S.E.2d at 675–76.  We concluded that the mother and child were both "patients" of the defendant, each of whom was entitled to a separate statutory damage cap under the Virginia Medical Malpractice Act.  Bulala, 239 Va. at 229, 389 S.E.2d at 675–76.  We preserved Modaber's rule that prenatal injury to a fetus constitutes physical injury to the mother and, therefore, permitted the mother to recover damages for the "mental suffering resulting from the birth of a defective child."  Bulala, 239 Va. at 229, 389 S.E.2d at 675.

Concluding that, at the moment of birth, the child also became the defendant's "patient," we allowed the child to recover "the usual elements of damage . . . appropriate to any infant's personal injury action."  Bulala, 239 Va. at 229–30, 389 S.E.2d at 676.  Under the rule we announced the same day in Kalafut v. Gruver, 239 Va. 278, 389 S.E.2d 681 (1990), damages recoverable by the impaired child included those arising out of harm inflicted on the child by the defendant before birth.  Bulala, 239 Va. at 229, 389

15

S.E.2d at 675. In Kalafut, "[w]e drew the line between nonliability and liability for prenatal injury at the moment of live birth of the child, when the child becomes a 'person,'" Bulala, 239 Va. at 229, 389 S.E.2d at 675, and accordingly held that a "tortfeasor who causes harm to an unborn child is subject to liability to the child, or to the child's estate, for the harm to the child, if the child is born alive." Kalafut, 239 Va. at 283–84, 389 S.E.2d at 684.

The decisions in Bulala and Kalafut collectively established that, when a fetus sustains injury and is subsequently born alive, the mother and the impaired child each have a claim for damages resulting from the negligently caused, in utero injury. Those two claims, however, encompass different elements. As the Court in Bulala uniformly accepted, a mother's claim is solely for her mental suffering arising from the birth of a defective child. Whatever disagreement existed in that case as to whom was a proper plaintiff turned on whether the child could assert her own claims for injuries she suffered prior to becoming a legal "person." See Bulala, 239 Va. at 235–37, 389 S.E.2d at 679–80 (Russell, J., dissenting).

Even in the absence of settled precedent, Dr. Castle's arguments are without merit. Dr. Castle does not assert

16

that Modaber was wrongly decided.  But, in Dr. Castle's view, the mother's physical injury due to injury to her fetus disappears at the moment her child is born alive, as if it had never occurred.  Such an outcome would be inconsistent with the holding in Modaber, and we decline to make it the law of the Commonwealth.

Neither can we accept Dr. Castle's double-recovery argument as a justification for overturning Bulala.  We have considered and discarded the same proposition on more than one occasion.  The doctor in Bulala contended that his alleged negligence caused "but one injury—the injury to the child."  Brief of Appellant Bulala at 9, Bulala v. Boyd, 239 Va. 218, 389 S.E.2d 670 (1990) (Record No. 890900).  On that basis, he argued further, "Any claim which the parents may have is derivative of the action for the injury to the child."  Id.  The Court agreed that the claim for emotional distress asserted by the child's father was "wholly derivative of the child's claim," but specifically held, "[T]he mother, as part of her claim, would be entitled to recover for mental suffering resulting from the birth of a defective child."  Bulala, 239 Va. at 229, 389 S.E.2d at 675 (emphasis added).

Our other decisions confirm that Dr. Castle's double-recovery argument is without merit.  In Kalafut, we made it

17

clear that "in Modaber we did not say that injury to the fetus constituted harm only to the mother . . . ." 239 Va. at 285, 389 S.E.2d at 684. Two years later, in McCarty, we upheld an award of damages for a mother's emotional distress resulting from injuries inflicted in utero that caused her child to be born with severe neurological impairments. 244 Va. at 37, 419 S.E.2d at 626–27. The defendant in that case advanced the same argument raised by Dr. Castle, namely, that a mother should not be allowed to recover damages for mental anguish caused by giving birth to an impaired, but living, child. See Brief of Appellant at 35–41, Fairfax Hosp. Sys., Inc. v. McCarty, 244 Va. 28, 419 S.E.2d 621 (1992) (Record No. 911203). In doing so, the defendant in McCarty suggested that our holding in Bulala did not permit a mother to recover damages for mental suffering resulting from prenatal injury to the fetus, but only recognized a mother's claim for mental anguish damages stemming from the physical injuries she suffered personally, separate and apart from those inflicted upon the fetus. See id. at 39. Despite the fact the mother in McCarty did not suffer an independent physical injury during her labor and delivery of the child, as did the mothers in this case and in Bulala, we dismissed the proposed distinction and, once again, held that a

18

mother can recover damages for her mental suffering resulting from the birth of an impaired child, irrespective of her impaired child's separate cause of action. McCarty, 244 Va. at 37, 419 S.E.2d at 626–27.

In light of our conclusion that Bulala remains good law and should not be overturned, Instruction No. 6 was a correct statement of the law, and the trial court did not err in giving the instruction to the jury. Nevertheless, Dr. Castle argues that Instruction No. 6, when read in conjunction with Instruction No. 5, confused the jury as to whom—Lester or Dusty—was entitled to compensation for Dusty's physical injuries. For that reason, he insists giving Instruction No. 6 constituted reversible error. Specifically, he contends that, after the trial court told jurors in Instruction No. 5 that they should consider, in determining Lester's damages, "any bodily injuries she sustained," the instruction, "[I]njury to an unborn child in the womb of the mother is to be considered as physical injury to the mother," wrongly allowed the jury to compensate Lester for all of Dusty's bodily injuries.

Undeniably, "the office of an instruction is to fully and fairly inform the jury as to the law of the case applicable to the particular facts, and not to confuse them." Gaalaas v. Morrison, 233 Va. 148, 156, 353 S.E.2d

19

898, 902 (1987) (internal quotation omitted).

"Instructions should be pertinent to the issues and set out correct legal principles complete in themselves as far as they go with regard to the specific issues involved. If an instruction may reasonably be regarded as having a tendency to mislead the jury, it is error to give it." H.W. Miller Trucking Co. v. Flood, 203 Va. 934, 937, 128 S.E.2d 437, 440 (1962). We will not find error when a jury was instructed correctly as to the law and the surrounding circumstances assure us that the jury was not confused about its obligations. See Murray v. Commonwealth, 225 Va. 13, 16–17, 300 S.E.2d 740, 742–43 (1983).

The record in the case at bar reveals multiple instances when the trial court and both parties apprised the jury that Lester's claims were not to be confused with Dusty's. Before impaneling the jury, the trial court provided the veniremen with some details about the case in an instruction drafted by the parties:

> The facts are as follows, a brief summary. Dusty Lester, Jr., who is now 15 months old was born on June 22nd of 2004. He suffers from severe neurological injury. This case is being brought by the mother, Karyn Lester, for her damages as a result of injuries to her son. The parties have stipulated as to liability. Therefore, the only issue before you is that of damages.

During voir dire, counsel for Lester explained:

[I]n this case the law says that injury to a baby in the womb is injury to the mother. And you will get that instruction later on in the case. Before birth an injury to the baby is an injury to the mother. . . .

. . .

. . . And as a result you will not hear testimony about the medical costs of raising the baby, of caring for the baby. You will not hear about the baby's future or anything like that. This is the mother's claim for injury.

Counsel for Dr. Castle provided the venire with an even clearer explanation of the issue in the case:

This case that you are going to hear . . . is not a case for you to determine injuries to Dusty Lester, Jr., and, more importantly, to compensate Dusty Lester, Jr. for those injuries.

Those issues are for another group, another day. It is not your job to award compensation to Dusty Lester, Jr. for injuries that he sustained during the birth process.

Rather what you are going to be asked to do is to compensate his mother for her emotional distress in dealing with the fact that her son was injured in the birth process.

You are not compensating the child. That's why you're not going to hear anything about the costs of raising the child or anything like that. That's for others to decide. What you are going to decide only, only [sic] is the issue with respect to the mother's damages.

He then asked, "[I]s there anybody on this panel who cannot separate the two and deal with only the issue that I've outlined for you?" No one on the panel responded in the affirmative.

21

Before opening statements, the trial court cautioned the jurors:

> This case involves an action by Karyn Lester, the mother of Dusty Lester.  It is separate and apart from any separate action brought by her child, Dusty Lester.
>
> You are not to concern yourselves with any action brought on behalf of the child and should only consider this current action by the mother against the defendant, Dr. Castle, which is the case you are deciding today and tomorrow.

In his opening argument, Dr. Castle's attorney again reminded the jury that what it was being

> asked to do is keep separate and apart the case involving the injuries to the child which are admittedly severe.  They are catastrophic.  There is no doubt about that.
>
> But, as I discussed with you earlier this morning and as Judge Finch instructed you a few minutes ago, that's for another group, that's for another day.  What we're talking about here are the injuries to Mrs. Lester.

Both sides touched on the subject again in their closing arguments.  Lester's counsel told the jury, "[Counsel for Dr. Castle] will tell you, 'This is not the baby's case.  This is the mother's case.  And don't confuse the two.'  And he's right.  I agree with him there."  Counsel for Dr. Castle stated:

> As I said to you before and as Judge Finch has said to you, those child's problems are for others to view at another time.

22

He admonished you, if you recall, at the beginning of the evidence that you need to and indeed you are instructed to keep the two separate. You are not to compensate Karyn Lester for the injuries that Dusty Lester sustained. You are to compensate Karyn Lester for her injuries. . . .

. . .

Clearly the woman is entitled to compensation. However, what she is not entitled to is what belongs to Dusty Lester. What belongs to Dusty Lester is for, as I said, others to decide. We need to separate them. As hard as that it is, we need to separate them.

Thus, the record is replete with reminders to the jury about its obligation to compensate Lester only for her damages, not for the damages sustained by her son. Furthermore, the jurors did not hear evidence pertaining to Dusty's claims, for example, evidence of his medical expenses.[3] We do observe, however, that Dr. Castle would have been entitled to an instruction clarifying Instructions Nos. 5 and 6 and stating that, although an injury to a fetus is considered a physical injury to the mother, Lester, upon giving birth to an impaired child, was not entitled to recover damages for the child's physical injuries. If Dr. Castle proffered such an instruction and

_____

[3] Indeed, Lester conceded in her response to Dr. Castle's pretrial motion in limine that evidence of Dusty's medical expenses was immaterial to Lester's claims and should properly be excluded.

23

the trial court denied it,[4] he has not assigned error to that denial, and we will not consider any such issue on appeal. Rule 5:17(c). Considering the circumstances of the entire trial and the fact that both Instruction Nos. 5 and 6 were correct statements of the law, we find no basis on which to conclude that the two instructions had a tendency to mislead the jury about the issue before it or that the jury awarded damages to Lester for Dusty's physical injuries.

As an alternative to overruling Bulala, Dr. Castle urges the Court to limit Lester's recovery to her mental anguish resulting from giving birth to Dusty, as opposed to her emotional distress arising from living with and caring for him. Dr. Castle's proposed dichotomy is rooted in the literal language of the Bulala opinion: "[T]he mother, as a part of her claim, would be entitled to recover for mental suffering resulting from the birth of a defective child."

_____

[4] After Lester rested her case, counsel for Dr. Castle purported to "renew [a] motion" that the jury be reminded that they were not to compensate Lester for the injuries sustained by Dusty. It is not clear from the record whether the "motion" he referred to was his earlier objection to Instruction No. 6 or his pre-trial motion to exclude evidence of Dusty's injuries and life expectancy. Nothing in the record indicates that Dr. Castle offered any formal instruction referring to the admonition he sought. Moreover, the trial court, in denying Dr. Castle's "motion," concluded that it had already made the

24

239 Va. at 229, 389 S.E.2d at 675 (emphasis added).  He argues that only evidence related to the "circumstances surrounding birth" should have been introduced at trial because, otherwise, the evidence before the factfinder would be indistinguishable from the evidence presented to prove Dusty's pain-and-suffering claim.  In other words, Dr. Castle says the trial court erred in admitting Lester's evidence concerning the daily tasks required to care for Dusty and her use of the cumbersome medical equipment in doing so, her frustration from sleepless nights, and her knowledge that her son will not live more than a few more years.

We find no error in the admission of the challenged evidence.  Although Dr. Castle settled Dusty's claims and stipulated liability for Lester's injuries, the evidence relating the extent of Dusty's impairments and the nature of the care Lester has to provide to Dusty on a daily basis was relevant to the issue of her continuing mental anguish caused by giving birth to an impaired child.  The jury was entitled to know the severity of Dusty's impairments and his daily needs in order to assess the credibility of Lester's mental anguish claim and to determine whether it

distinction clear to the jury in "the all-encompassing instruction" it gave before opening arguments.

25

was commensurate with the severity of Dusty's impairments. Indeed, if Dusty had recovered from the injuries he sustained in utero, Dr. Castle would undoubtedly want the jury to know that fact in assessing the credibility of Lester's mental suffering claim.

Furthermore, Dr. Castle's argument that the event of Dusty's birth should be separated from Lester's ongoing task of caring for her impaired son cannot be reconciled with recognized principles of proximate causation. Our opinion in Naccash v. Burger, 223 Va. 406, 290 S.E.2d 825 (1982), provides a good illustration. In that case, the defendant-physician negligently failed to ensure that a blood sample taken from an expecting parent was properly labeled, thereby depriving the parents of important information needed to make an informed decision about whether to terminate the pregnancy because their unborn child was affected by an incurable genetic disorder. Id. at 414, 290 S.E.2d at 829. We held that the parents were "entitled to recover those damages which are the reasonable and proximate consequences of the breach of the duty owed them, viz., consequences that a reasonable and informed person could have foreseen and anticipated." Id. at 414, 290 S.E.2d at 830 (citing Tullock v. Hoops, 206 Va. 665, 668-69, 145 S.E.2d 152, 154 (1965)). Thus, the parents

properly recovered damages for the emotional distress they endured in watching their child, whom they would have aborted but for the defendant's negligence, deteriorate and ultimately die.  Id. at 411, 414, 290 S.E.2d at 828, 830. Notably, as in the present case, the evidence included the parents' testimony outlining "the tragic course of the disease in [their daughter] and the nature and extent of the care and treatment she required as her condition degenerated."  Id. at 411, 290 S.E.2d at 828.

The mental anguish damages sustained by Lester are the reasonably foreseeable consequences of Dr. Castle's negligence.  The injury caused by Dr. Castle's breach of his duty of care to his patient, Lester, was the in utero injury resulting in her child being neurologically impaired.  The mental anguish she suffers almost every waking minute of her life results entirely from that injury, as does her clinical depression and her concomitant inability to work.  Dr. Castle has not advanced any reason why we should allow a mother to recover some, but not all, of the mental anguish damages that are proximately caused by his negligence, and we find no reason to do so.

Moreover, the ramifications that would flow from bifurcating proximately caused mental suffering damages reinforce our conclusion that such an undertaking is

27

unworkable.  If the mother's recovery were limited to emotional injuries arising from "the circumstances surrounding birth," courts would have a difficult task in fashioning a remedy when, as is the case here, the mother learns about the severity of her child's impairment incrementally over time.  During oral argument, Dr. Castle suggested that "there has to be some rule of reason that is applied," and that where the line should be drawn between what is and is not compensable will turn "on the facts and circumstances of the case."  It is unclear what facts or circumstances would support such an arbitrary distinction, but we are certain they are not present in this case.

## B.  Motion for Mistrial

In his third assignment of error, Dr. Castle asks us to reverse the trial court's judgment because of its refusal to grant his motion for a mistrial after Lester offered allegedly improper and incurably prejudicial testimony in the presence of the jury.  The relevant facts are as follows:

In response to a question whether, during Dusty's nine-week, postnatal hospitalization, she had any conversations with Dr. Castle about Dusty's condition, Lester mentioned that Dr. Castle had "left the hospital during [her] labor."  Dr. Castle immediately moved for a

28

mistrial, claiming prejudice to the defense since he had already admitted liability.  Upon assurances from Lester's counsel that the improper testimony was inadvertent, the trial court denied the motion for a mistrial, but asked counsel for Dr. Castle whether he wanted the court to give a cautionary instruction to the jury concerning the challenged testimony.  Dr. Castle's counsel responded that he would think about the matter, but he never asked for the cautionary instruction.

Later, during a short recess in the trial, a juror, John Phillips (Phillips), notified a courtroom deputy that Lester's testimony concerning Dr. Castle's departure from the hospital reminded him of an article he had read in a newspaper describing a similar incident.  He was concerned that he had read about the case at bar and that the information gleaned from the article would compromise his impartiality.  The trial court brought Phillips' situation to the attention of the parties and asked whether they would agree to proceed with only six jurors.  Dr. Castle did not agree to that arrangement, but rather renewed his motion for a mistrial, arguing that the entire jury panel had been tainted.

The trial court summoned Phillips to the courtroom, out of the hearing of the rest of the jurors, and asked him

if he had mentioned the article or his recollection of it to any other jurors. Phillips responded that he had not. On stipulation of the parties that there had not been any media coverage of the case at bar, the trial court instructed Phillips that the incident he had read about in the newspaper did not involve this case. Phillips then assured the trial court that he would not be biased since the newspaper article concerned a different situation from the instant matter. The trial court instructed Phillips not to relate any information contained in the newspaper article to any of the other jurors and allowed the trial to proceed.

"The decision whether to grant a motion for a mistrial is a matter submitted to the trial court's sound discretion." Lowe v. Cunningham, 268 Va. 268, 272, 601 S.E.2d 628, 630 (2004) (citations omitted). Generally, "absent a manifest probability of prejudice to an adverse party, a new trial is not required when a court sustains an objection to an improper remark or question by counsel and thereafter instructs the jury to disregard the remark or question." Id. at 272, 601 S.E.2d at 630. However, "when the prejudicial effect of an improper remark or question is overwhelming, such that it cannot be cured by a cautionary instruction," a trial court must grant a new trial, if

requested.  Id. at 273, 601 S.E.2d at 631.  In determining whether a statement is so inherently prejudicial that a cautionary instruction cannot cure the prejudice, several factors must be considered.  Those factors include "the relevance and content of the improper reference, . . . whether the reference was deliberate or inadvertent[, and] the probable effect of the improper reference."  Id. at 273, 601 S.E.2d at 631.

Here, the trial court specifically found Lester's testimony was inadvertent.  Dr. Castle does not challenge that finding on appeal.  Nor did he accept the trial court's offer to give the jury a cautionary instruction or ask the court to strike that portion of Lester's testimony.  When the trial court advised juror Phillips that the incident he had read about did not involve the case at bar, Phillips assured the court that he would not be biased and had not told any other jurors about the article.  Contrary to Dr. Castle's argument, the entire jury was not tainted, nor did the trial court abuse its discretion in denying Dr. Castle's motion for a mistrial.

### III.  CONCLUSION

After a full deliberation of the issues, we again affirm the holding in Bulala that a mother can recover, as an element of her own cause of action, damages for her

31

mental suffering resulting from the birth of an impaired child.  Thus, we conclude that the trial court did not err in giving Instruction No. 6 or in admitting evidence regarding Dusty's impairments, daily care needs, and life expectancy, and evidence addressing Lester's depression and lost earnings.  Finally, the trial court did not abuse its discretion in refusing to grant Dr. Castle's motion for a mistrial.

For these reasons, we will affirm the judgment of the circuit court.

<u>Affirmed</u>.