Present:  Hassell, C.J., Keenan, Koontz, Kinser, Lemons, and
          Goodwyn, JJ., and Carrico, S.J.

JAN PAUL FRUITERMAN, M.D., ET AL.

v.    Record No. 071894      OPINION BY JUSTICE CYNTHIA D. KINSER
                                        October 31, 2008
JULIE GRANATA


JOSEPH GRANATA

v.    Record No. 071897

JAN PAUL FRUITERMAN, M.D., ET AL.

             FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                    Jonathan C. Thacher, Judge

     In these wrongful birth cases filed by the parents of twin

daughters afflicted with Down syndrome, the circuit court

sustained a jury verdict in favor of the mother.  We will

reverse that judgment because the evidence was insufficient as

a matter of law to prove the element of proximate causation.

With regard to the father's case, the circuit court granted a

motion to strike the evidence because the father failed to

prove a physician-patient relationship.  We will affirm that

judgment.

                      I. PROCEDURAL HISTORY

     Julie Granata and Joseph Granata (the Granatas) each filed

a separate but identical motion for judgment in the circuit

court, alleging that Jan Paul Fruiterman, M.D., Eleni Solos-

Kountouris, M.D., and their professional corporation, Drs.

Fruiterman and Solos-Kountouris, P.C. (collectively, the Doctors), undertook to provide obstetrical services and prenatal care to the couple, thereby establishing a physician-patient relationship with both Julie and Joseph. The Granatas further alleged that the Doctors breached the standard of care by failing to provide Julie with information about first trimester testing known as chorionic villus sampling (CVS),[1] which would have revealed that her twin fetuses were afflicted with Down syndrome. Additionally, the Granatas alleged that, if Julie had known about the condition of her fetuses during the first trimester, she would have elected to terminate the pregnancy. As a direct and proximate result of the Doctors' alleged negligence, Julie and Joseph claimed damages for, among other things, mental and emotional distress, medical and hospital bills for the care of the twins, and lost family income.

The two actions were tried together before the same jury. In motions to strike both at the close of the Granatas' evidence and at the close of all the evidence, the Doctors argued, among other things, that the Granatas failed to prove

---

[1] CVS is a procedure by which a sample of the chorionic villi, or placental tissue, is obtained from the expectant mother and the cells are tested for genetic disorders such as Down syndrome. CVS may be performed between the tenth and thirteenth week of a pregnancy.

by expert testimony to a reasonable degree of medical probability that, if Julie had undergone CVS testing, the result would have been positive for Down syndrome. The Doctors also asserted that Joseph failed to prove the existence of a physician-patient relationship. Therefore, they argued his claim was, at most, only derivative of Julie's claim.

The circuit court took all the motions to strike under advisement and elected to decide them, if needed, after the jury returned verdicts. In separate verdicts, the jury found in favor of Julie and awarded damages in the amount of $4,000,000. The jury also found in favor of Joseph and awarded $500,000 in damages.

In post-trial motions, the Doctors renewed their motions to strike the Granatas' evidence. They also asked the circuit court to set aside the jury verdicts and either enter judgment in their favor or grant them a new trial. The Doctors alternatively moved the circuit court to reduce the verdicts in accordance with the statutory cap for recoveries in medical malpractice actions pursuant to Code § 8.01-581.15.

At the post-trial hearing, the Doctors presented the same arguments that they raised in the motions to strike the evidence. With respect to whether the Granatas proved by expert testimony that the results of CVS would have been positive for Down syndrome, the circuit court asked whether

3

"there was any evidence that if a CVS had been done it would have returned a positive result." The Granatas acknowledged there was no such evidence in the record. Regardless, the circuit court overruled the Doctors' motions and sustained the jury verdict in Julie's favor. The court did, however, reduce the award to $1.6 million pursuant to Code § 8.01-581.15.

With regard to Joseph, the circuit court granted the Doctors' motion to strike and dismissed his case. In a letter opinion, the court concluded that, in the absence of an undertaking by Dr. Solos-Kountouris, Joseph was not a patient and could not reasonably have expected to be a patient as defined in Code § 8.01-581.1.[2] The court explained, "[i]f someone who merely accompanied a patient on a visit to the patient's physician was able to recover for emotional distress, the end result would be an extension of the physician's liability beyond all reasonable or logical bounds."

The Doctors and Joseph filed separate appeals from the respective judgments of the circuit court. With regard to the Doctors' appeal, the dispositive issue is whether Julie proved through expert testimony to a reasonable degree of medical probability that, if CVS testing had been conducted, the result

---

[2] During the hearing on the Doctors' post-trial motions, Joseph stipulated that the verdict in his favor against Dr. Fruiterman should be set aside because he had no interaction with Dr. Fruiterman on certain relevant dates.

4

would have shown the chromosomal abnormality associated with Down syndrome.  Joseph assigns two errors to the circuit court's judgment.  He first claims the court erred in ruling that he failed to prove a physician-patient relationship with Dr. Solos-Kountouris or her professional corporation.  Second, Joseph asserts that the court erred in failing to find that Dr. Solos-Kountouris undertook to provide health care to him by advising about genetic testing.

We will now present the relevant facts and then address the issues raised in each appeal, starting with the Doctors' appeal.

## II. DOCTORS' APPEAL

### A. Relevant Facts

In February 2002, Julie met with Dr. Solos-Kountouris for pre-conception counseling and a gynecological examination.  Dr. Solos-Kountouris discussed the risks associated with conceiving a child when the mother is past the age of 35, in particular the risk of having a fetus with a chromosomal abnormality.[3]  According to Dr. Solos-Kountouris, she emphasized the

---

[3] Julie was 37 years of age at the pre-conception appointment with Dr. Solos-Kountouris.

5

importance of screening tests, including CVS and amniocentesis,[4] and explained how such procedures are performed, the risks associated with them, and the time frame during a pregnancy when the mother can undergo the tests.

Julie's testimony about the initial appointment differed from that of Dr. Solos-Kountouris. Julie stated that Dr. Solos-Kountouris discussed and recommended only amniocentesis. Julie testified about how she explained to Dr. Solos-Kountouris that, since amniocentesis is performed 16 to 18 weeks into the pregnancy, she felt the pregnancy would be too far along to terminate if the procedure revealed an abnormality. According to Julie, after the first trimester she would feel and look pregnant, and "it's a baby, not a fetus" at that point. To Julie, "anything past the first trimester is . . . when my responsibility is to manage the pregnancy."

Julie further testified that Dr. Solos-Kountouris told her amniocentesis was the "only way" to determine whether a fetus has a chromosomal abnormality. Moreover, Julie insisted that no one at the Doctors' office mentioned CVS during either her initial appointment or her subsequent appointments.

---

[4] During amniocentesis, a large needle is inserted into the amniotic sac and a small amount of the fluid is removed. The cells in the fluid are then tested to determine certain genetic disorders, such as Down syndrome. Amniocentesis is not performed earlier than the sixteenth week of a pregnancy.

Soon after the pre-conception counseling visit, Julie became pregnant and returned to the Doctors in March 2002 to confirm her pregnancy.  At that appointment, she saw Dr. Fruiterman, who, like Dr. Solos-Kountouris, recommended that Julie undergo amniocentesis.  According to Julie, she again rejected amniocentesis because, in her view, it is performed too far along in the pregnancy.

Throughout her pregnancy, Dr. Fruiterman and Dr. Solos-Kountouris also recommended that Julie receive genetic counseling.  Despite their recommendations, Julie never attended genetic counseling.  Additionally, she never underwent amniocentesis, despite a positive alpha-fetoprotein blood test result in June 2002.  The result signaled that the fetuses had a high risk for Down syndrome.  In September 2002, Julie gave birth to identical twin girls, both of whom are afflicted with Down syndrome.

At trial, Julie insisted that, if the Doctors had advised her about the availability of CVS either before or during the first trimester of her pregnancy, she would have undergone the test.  Julie stated she would not have bonded with her fetuses before the test could have been performed.  She further testified that, if the test result had been positive, meaning her twin fetuses were afflicted with Down syndrome, she "would have to have had a double abortion."

7

The Granatas presented testimony from two medical expert witnesses. The first witness, John Williams, III, M.D., an expert in the field of obstetrics and gynecology, testified to the standard of care for an obstetrician to inform his patients about the availability of CVS. In forming his opinions, Dr. Williams relied upon medical literature, one of which described amniocentesis and CVS as "definitive diagnostic test[s]."

During cross-examination, Dr. Williams admitted that there is a possibility of receiving a false result from CVS, but claimed such a result is "extremely rare." When asked if there are instances of positive CVS results that have been disproved by later tests indicating a fetus is normal, Dr. Williams explained that there are occasions when there is a "mixture of normal and abnormal cells, and in that situation better than 90 percent of the time the fetus is not affected." He also stated that about 1-in-100 patients would require a follow-up amniocentesis to "sort things out" after receiving a positive CVS. At no time during his testimony did Dr. Williams state his opinion as to whether CVS would have been positive for Down syndrome if Julie had undergone that test.

Similarly, the Granatas' other medical expert witness, Ronald J. Wapner, M.D., also an expert in the field of obstetrics and gynecology, expressed no opinion on that

8

particular issue.  Dr. Wapner, like Dr. Williams, acknowledged that one of the risks associated with undergoing either CVS or amniocentesis is the possibility of having "false positives and false negatives, and sometimes information that just won't be interpretable at all."

One of the Doctors' witnesses, Mary E. D'Alton, M.D., who testified as an expert in the field of obstetrics and gynecology, stated there is a problem in using CVS in the case of twin fetuses because of the potential for "cross-contamination . . . between the placentas" or two samples from only one fetus.  Thus, in her opinion, a 1-in-20 chance exists that a CVS in a pregnancy with twin fetuses will provide mixed information, thereby requiring further testing such as amniocentesis.  Additionally, Dr. D'Alton testified that there is a "potential for misdiagnosis with CVS that is not there with amniocentesis."

## B. Analysis

In addressing the Doctors' challenge to the sufficiency of the evidence to prove that, if Julie had undergone CVS, the result would have shown the chromosomal abnormality associated with Down syndrome, we apply established principles of appellate review.  A plaintiff who is "[a]rmed with a jury verdict approved by the trial court, . . . stands in 'the most favored position known to the law.' "  Bitar v. Rahman, 272 Va.

9

130, 137, 630 S.E.2d 319, 323 (2006) (quoting Ravenwood Towers, Inc. v. Woodyard, 244 Va. 51, 57, 419 S.E.2d 627, 630 (1992)). When a trial court has refused to strike a plaintiff's evidence or to set aside a jury verdict, the well-established standard of appellate review requires this Court to determine whether the evidence presented at trial, taken in the light most favorable to the plaintiff, was sufficient to support the jury verdict in favor of the plaintiff. Id. at 141, 630 S.E.2d at 325-26. We will not set aside a trial court's judgment sustaining a jury verdict unless it is "plainly wrong or without evidence to support it." Code § 8.01-680; see also Bitar, 272 Va. at 137, 630 S.E.2d at 323.

In Julie's wrongful birth case, as in any medical malpractice action, one of the elements that a plaintiff must prove is "a causal connection between the breach of duty and any claimed injury or damage." Naccash v. Burger, 223 Va. 406, 414, 290 S.E.2d 825, 829 (1982); see also Bryan v. Burt, 254 Va. 28, 34, 486 S.E.2d 536, 539-40 (1997) ("[A] plaintiff must establish not only that a defendant violated the applicable standard of care, and therefore was negligent, the plaintiff must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury."); Brown v. Koulizakis, 229 Va. 524, 532, 331 S.E.2d 440, 446 (1985) (same).

Although the issue of proximate causation is normally a question of fact for the jury to determine, a court may decide the issue "when reasonable persons could not differ." Jenkins v. Payne, 251 Va. 122, 128, 465 S.E.2d 795, 799 (1996); accord Hadeed v. Medic-24, Ltd., 237 Va. 277, 285, 377 S.E.2d 589, 593 (1989). Expert testimony is generally required to establish not only the appropriate standard of care and a deviation from the standard, but also " 'that such a deviation was the proximate cause of the claimed damages.' " Perdieu v. Blackstone Family Practice Ctr., Inc., 264 Va. 408, 420, 568 S.E.2d 703, 710 (2002) (quoting Raines v. Lutz, 231 Va. 110, 113, 341 S.E.2d 194, 196 (1986)); accord Bitar, 272 Va. at 138, 630 S.E.2d at 323.

In the case before us, Julie claimed the Doctors breached the standard of care by failing to inform her about the availability of CVS either prior to or during her pregnancy. She further alleged that, if she had known about CVS at a time during the pregnancy when she could have had the test, she would have done so and would have terminated her pregnancy if the result had been positive for Down syndrome.

Julie, however, did not prove to a reasonable degree of medical probability that, if she had undergone CVS, the result would have shown the chromosomal abnormality indicative of Down syndrome. None of Julie's medical expert witnesses opined

11

about what the result of CVS would have been if Julie had undergone the procedure.  Moreover, the Granatas acknowledged before the circuit court that no such evidence existed in the record.  Thus, Julie failed to establish that the Doctors' breach of the standard of care was a proximate cause of the wrongful birth of her twin daughters.

Julie, nevertheless, contends Dr. Williams' testimony, read from medical literature that classified CVS as a "definitive diagnostic test," provided the requisite proximate cause.  Julie argues on appeal that the term "definitive" means CVS results would have been positive if she had undergone the procedure.  We are not persuaded by her argument.  The term "definitive" means "serving to supply a final answer, solution, or evaluation and to end an unsettled unresolved condition." Webster's Third New International Dictionary 592 (1993).  The term does not signify that a certain answer will be provided; it indicates only that <u>some</u> answer will be ascertained.

Because her twin daughters unquestionably have Down syndrome, Julie also contends she is entitled to an inference that if she had undergone CVS, the result would have been positive for Down syndrome.  This is so, according to Julie, because in CVS, the laboratory technician has only to count the number of chromosomes to determine whether there is an extra

copy of chromosome 21, meaning the presence of Down syndrome. Again, we do not agree.

This wrongful birth case is not one of those "rare instances" in which expert testimony is not required to prove, among other things, that breach of the standard of care was a proximate cause of the claimed damages. Beverly Enterprises Virginia, Inc. v. Nichols, 247 Va. 264, 267, 441 S.E.2d 1, 3 (1994); see also Coston v. Bio-Medical Apps. of Va., 275 Va. 1, 5, 654 S.E.2d 560, 562 (2008). Whether the result of CVS would have been positive for Down syndrome if Julie had undergone that procedure is not a matter within the common knowledge and experience of a jury. See Perdieu, 264 Va. at 420–21, 568 S.E.2d at 710–11. Furthermore, the Granatas' evidence from their medical expert witnesses showed that many patients require a follow-up amniocentesis after receiving a positive CVS. The Granatas, through their medical experts, also presented evidence about the risks of false positive and false negative results with CVS.

Thus, we conclude that the circuit court erred in refusing to set aside the jury verdict in Julie's favor.[5] The judgment was without evidence to support it. Code § 8.01-680.

---

[5] In light of our decision, we will not address the Doctors' other assignments of error.

13

III. JOSEPH'S APPEAL

A. Relevant Facts

With regard to the questions whether Joseph proved a physician-patient relationship with Dr. Solos-Kountouris and if not, whether Dr. Solos-Kountouris nevertheless undertook to provide Joseph with health care, Joseph acknowledges that he must rely on the events that transpired during Julie's April 19, 2002 appointment to establish that Dr. Solos-Kountouris owed him a duty of care.  Joseph testified that he first accompanied Julie to the Doctors' office on that date and conceded at trial and before this Court that all the alleged negligence occurred on or before April 19, 2002.  Therefore, we focus on the facts surrounding Julie's April 19, 2002 appointment.

In that regard, Joseph provided the only relevant testimony.[6]  During his direct examination, the following exchange occurred:

> Q.  [Counsel for the Granatas] I direct your attention then, Mr. Granata, specifically to the date of April 19th.  Do you recall anything at all that was significant?
>
> A.  [Joseph] I do.  April 19th was the first time I went to the doctor with Julie.  It was at the

---

[6] Julie's testimony confirmed that Joseph accompanied her to the April 19th appointment but provided no specific information concerning any interaction between Dr. Solos-Kountouris and Joseph.  Dr. Solos-Kountouris did not mention Joseph in connection with the April 19th appointment.

Burke office.  I remember going in the office and waiting in a chair next to Julie.

We filled out some paperwork.  We also filled out a genetic screening questionnaire, and then they came to get Julie and I started to walk back to be with her for the exam, and they asked me to wait outside until they would call me at a later time.

Q.  What happened then when they brought you back?

A.  I went back.  Dr. Sol[o]s, myself and Julie were discussing her pregnancy.  I remember discussing the genetic questionnaire.  I remember when Julie was filling out the questionnaire my nephew had something called Prader-Willi, and Julie was writing down that it was a form of Down syndrome, and I remember telling her I don't think it's a form of Down syndrome.

I wouldn't put it there in a spot where it had, I guess, any genetic Down syndrome-related children or relatives.  We spoke about that genetic screening sheet for a while.  I remember the doctor mentioning amniocentesis. I remember that we talked about if the twins were in one egg or in two sacs . . . .

Q.  Can you tell us what Dr. Sol[o]s told the two of you when she was discussing the genetic screening form[?]

A.  When we were discussing the genetic screening form, I remember her asking some questions about my nephew, about my ethnicity.  If there was any other history in my family background that had any kind of genetic disorder.

Q.  Why were you there at the appointment with Julie?

A.  Well, because I was – you know, we were a family.  That was part of what we were going through together.  This was my children as well.

Q.  What recommendations, if any, did Dr. Sol[o]s make to the two of you?

15

A. Again, I believe she recommended amniocentesis, and I believe she recommended a geneticist.

Q. Let me ask you specifically if you can tell us whether or not the word "CVS" was mentioned by her.

A. I never heard that word ever until after the twins were born.

. . . .

Q. Let me ask [w]hat was your reason for being there to discuss these issues?

A. Because I was an active participant in the pregnancy. I wanted to support Julie, and I was seeking guidance from her doctors.

Joseph gave the following relevant testimony during cross-examination:

Q. [Counsel for the Doctors] When you attended the visit on April 19th, 2002, that was conducted by Dr. Sol[o]s-Kountouris, was advanced maternal age discussed?

A. [Joseph] Yes. When I was in the room there was a portion of the time when I was outside. When I was invited into the room to discuss the questionnaire, that was certainly a topic that was discussed as well as the twins being a potentially high-risk pregnancy because of those things.

Q. So the risks were discussed of this pregnancy?

A. That's correct.

Q. You also, I think, indicated to us Dr. Sol[o]s-Kountouris discussed the possibility or recommended amniocentesis at that time; is that correct?

16

A. That's correct . . . she also said there was plenty of time, but she wanted to put it out there so we had an opportunity to consider it.

. . . .

Q. Did Dr. Sol[o]s-Kountouris also talk to you about genetic counseling at that time?

A. I remember the conversation about genetic counseling. I don't remember specifically back and forth – it was during the time we were actually discussing the genetic questionnaire, and I remember questions about my nephew. I remember questions about my ethnicity.

. . . .

Q. And you participated in the completion of the genetic screening sheet on the April 19th visit?

A. Could you define what you mean by "completion." Did I help fill it out? Yes.

Q. You provided input to that form?

A. Yes.

In addition to Joseph, two of the Granatas' expert witnesses, Dr. Williams and Dr. Wapner, provided testimony relevant to the issues in Joseph's appeal. They opined about the relationship between an obstetrician and a father. Dr. Williams did not consider a husband to be an obstetric patient because there is no treatment or service of an obstetrical or gynecological nature that can be provided to a male individual. Dr. Williams, however, did state that when a physician takes care of a pregnant woman, the physician is "taking care of a couple[, s]o in that case the husband is not specifically an OB

17

patient, but we're taking care of the family." According to Dr. Williams, when a husband accompanies "his wife as the husband," they are "entitled to receive information regarding care of the pregnancy as well." Dr. Wapner stated, "[W]hen you're counseling about genetic risks to a fetus you are counseling the couple which includes – the woman and – and the man." Finally, Dr. Williams acknowledged that, if the term "medical care" is defined as the "giving of advice," then a husband should receive medical care.

## B. Analysis

Although the circuit court granted the Doctors' motion to strike the evidence in Joseph's case, it did so after the jury had returned a verdict in his favor. Regardless, the standard of appellate review is the same: whether the evidence viewed in the light most favorable to the plaintiff is sufficient to sustain a jury verdict in favor of the plaintiff. Bitar, 272 Va. at 141, 630 S.E.2d at 325-26.

The decision as to whether a physician-patient relationship exists "is a question of fact, turning upon a determination whether the patient entrusted his treatment to the physician and the physician accepted the case." Lyons v. Grether, 218 Va. 630, 633, 239 S.E.2d 103, 105 (1977). "A physician's duty arises only upon the creation of a physician-patient relationship; that relationship springs from a

18

consensual transaction, a contract, express or implied, general or special." Id.; accord Washburn v. Klara, 263 Va. 586, 590, 561 S.E.2d 682, 685 (2002) ("[T]he physician-patient relationship is a consensual one.") (citing Pugsley v. Privette, 220 Va. 892, 899, 263 S.E.2d 69, 74 (1980)); see also Harris v. Kreutzer, 271 Va. 188, 198, 624 S.E.2d 24, 30 (2006); Didato v. Strehler, 262 Va. 617, 626, 554 S.E.2d 42, 47 (2001).

Joseph first argues he meets the definition of the term "patient" as defined in Virginia's Medical Malpractice Act, (the Act), Code §§ 8.01-581.1 through -581.20:1, and therefore, Dr. Solos-Kountouris owed him a duty of care as a patient. In relevant part, the term " '[p]atient' means any natural person who receives or should have received health care from a licensed health care provider." Code § 8.01-581.1. Under the Act, the term " '[h]ealth care' means any act, professional services in nursing homes, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement." Code § 8.01-581.1.

Relying on these definitions and the testimony of Dr. Williams and Dr. Wapner, Joseph contends that a

physician's advice about genetic testing constitutes "health care" under the Act and that Dr. Solos-Kountouris' failure to advise about the availability of CVS was an "act . . . which should have been . . . furnished." Code § 8.01-581.1.  Continuing, Joseph asserts he was a person who should have received information from Dr. Solos-Kountouris about CVS and was, therefore, a "patient."

Joseph's argument, however, ignores the language included at the end of the definition of "health care," referring to any act or treatment which should have been furnished "during the patient's medical diagnosis, care, treatment or confinement."  Code § 8.01-581.1 (emphasis added).  As already noted, only the events that occurred during Julie's April 19, 2002 appointment are relevant to the question whether Dr. Solos-Kountouris diagnosed, cared for, or treated Joseph, in addition to Julie, on that date.  The facts surrounding the appointment, viewed in the light most favorable to Joseph, show that Joseph accompanied Julie to the Doctors' office, assisted Julie in filling out the genetic screening questionnaire, and responded to questions from Dr. Solos-Kountouris about his family background as to genetic disorders.  Joseph was excluded from the initial portion of Julie's appointment

20

with Dr. Solos-Kountouris and was, in Joseph's words, "invited into the room to discuss the questionnaire."

Although Dr. Solos-Kountouris discussed and/or recommended amniocentesis and genetic counseling, the evidence demonstrates her "diagnosis, care, [or] treatment" on that day was directed to Julie, not to Joseph. Code § 8.01-581.1. In other words, there is no evidence that Joseph "entrusted his treatment to [Dr. Solos-Kountouris] and the physician accepted the case." Lyons, 218 Va. at 633, 239 S.E.2d at 105; cf. Gray v. INOVA Health Care Servs., 257 Va. 597, 599-600, 514 S.E.2d 355, 356 (1999) (physician had no duty of care to the mother of a patient because the mother was not the physician's patient upon whom the procedure was being performed and any negligence was a breach of duty to the patient, not the mother); Bulala v. Boyd, 239 Va. 218, 230, 389 S.E.2d 670, 676 (1990) (stating that "the father, of course, was not the [obstetrician's] 'patient,' within the meaning of the Act"); Dehn v. Edgecombe, 865 A.2d 603, 615 (Md. 2005) ("A duty of care does not accrue purely by virtue of the marital status of the patient alone; some greater relational nexus between doctor and patient's spouse must be established.").

21

Furthermore, Joseph and Julie did not allege that the Doctors breached the standard of care by failing to advise them as a couple about genetic counseling or to recommend genetic screening tests that either Joseph alone or both of them would need to undergo. Instead, they asserted that the Doctors breached the standard of care by failing to inform Julie about the availability of CVS during the first trimester of her pregnancy. Obviously, Julie is the only person who could consent to and undergo that procedure. Information about CVS was not an "act . . . which should have been . . . furnished" to Joseph. Code § 8.01-581.1.

The medical expert witnesses' testimony about what constitutes health care does not alter our conclusion. In the context of a pregnancy, a husband may be entitled to receive such information about a fetus' risk of having genetic abnormalities. The question whether Joseph had a physician-patient relationship with Dr. Solos-Kountouris, however, turns solely on the facts surrounding the April 19, 2002 appointment. See Lyons, 218 Va. at 633, 239 S.E.2d at 105.

Thus, we conclude the evidence, as a matter of law, was insufficient to show "a consensual transaction giving rise to a physician-patient relationship and a duty to perform the service contemplated." Id.; see also Harris, 271 Va. at 199-

22

200, 624 S.E.2d at 30-31 (finding a limited physician-patient relationship exists in the context of a Rule 4:10 examination because the physician expressly consents to the relationship when he agrees to conduct the examination and the patient's consent is implied); Prosise v. Foster, 261 Va. 417, 423, 544 S.E.2d 331, 334 (2001) (refusing to impose a duty of care on an on-call physician in a teaching hospital in the absence of proof that the doctor agreed to accept responsibility for the care of the patient).

Relying on this Court's decision in Didato, Joseph next argues that even in the absence of a physician-patient relationship, Dr. Solos-Kountouris undertook to provide health care to him and was thus required to act in accordance with the standard of care.  See Code § 8.01-581.20.  In Didato, we noted the legal principle that "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all."  262 Va. at 628, 554 S.E.2d at 48 (quoting Nolde Bros. v. Wray, 221 Va. 25, 28, 266 S.E.2d 882, 884 (1980)).  The Court concluded the plaintiffs had "pled sufficient facts which, if proven at trial, would permit the finder of fact to conclude that the defendants assumed the duty" to provide health care.  Didato, 262 Va. at 629, 554 S.E.2d at 48.  Additionally, we rejected "[t]he defendants' contention that they could not assume a duty to a non-patient

to comply with the standard of care in Code § 8.01-581.20." Id.

As we recognized in Didato, a physician can, in certain circumstances, affirmatively undertake to provide health care to an individual, who prior to that moment was not the physician's patient, and thereby assume the duty to comply with the applicable standard of care. But see Code § 8.01-225. Such a scenario is in contrast to the more traditional situation where the patient "knowingly and voluntarily seeks the professional assistance of the physician, and the physician knowingly agrees to treat the patient." Kelley v. Middle Tenn. Emergency Physicians, P.C., 133 S.W.3d 587, 593 (Tenn. 2004). Nevertheless, in the former circumstance, the physician-patient relationship arises by implication because "the doctor takes affirmative action to participate in the care and treatment of a patient." Sterling v. Johns Hopkins Hosp., 802 A.2d 440, 455 (Md. Ct. Spec. App. 2002); see also Lownsbury v. VanBuren, 762 N.E.2d 354, 360 (Ohio 2002) ("[A] physician-patient relationship, and thus a duty of care, may arise from whatever circumstances evince the physician's consent to act for the patient's medical benefit.").

In Didato, the trial court sustained the defendants' demurrers, so we based our decision solely on the plaintiffs' pleadings. 262 Va. at 630, 554 S.E.2d at 49. We have not had

the occasion before today to decide whether particular evidence adduced at trial was sufficient to prove a physician undertook to provide health care to a non-patient, thereby assuming the duty to comply with the standard of care.  We agree with the holding in Jenkins v. Best, 250 S.W.3d 680, 693 (Ky. Ct. App. 2007), requiring a physician to "personally engage[] in some affirmative act amounting to a render[ing of] services to another."  Id. at 693 (second alteration in original; internal quotation marks omitted); see also Stanley v. McCarver, 92 P.3d 849, 853 (Ariz. 2004) (in the absence of the traditional physician-patient relationship, the court nevertheless imposed a duty of care because the physician undertook, for consideration, to interpret the patient's x-rays); Dekens v. Underwriters Laboratories Inc., 132 Cal. Rptr. 2d 699, 702 (Cal. Ct. App. 2003) (in applying the "negligent undertaking doctrine," the actor "must specifically have undertaken to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative duty to perform that undertaking carefully").

Applying these principles to Joseph's claim that Dr. Solos-Kountouris affirmatively undertook to provide him with health care, we again conclude the evidence was insufficient as a matter of law.  As demonstrated by our prior discussion,

25

Joseph did not establish an affirmative act by Dr. Solos-Kountouris during the April 19, 2002 appointment that would amount to the rendering of health care to Joseph.  See Jenkins, 250 S.W.3d at 693.  Thus, Dr. Solos-Kountouris assumed no duty to comply with the applicable standard of care with regard to Joseph.  We therefore hold that the circuit court did not err in granting the Doctors' motion to strike the evidence in Joseph's case.

## IV. CONCLUSION

We will reverse the judgment of the circuit court in the Doctors' appeal.  The evidence was insufficient as a matter of law to prove to a reasonable degree of medical probability that if Julie had undergone CVS, the result would have been positive for Down syndrome.

We will affirm the judgment of the circuit court in Joseph's appeal.  The evidence was insufficient as a matter of law to prove that either he had a physician-patient relationship with Dr. Solos-Kountouris or Dr. Solos-Kountouris engaged in an affirmative act amounting to the rendering of health care.

Record No. 071894 – Reversed and final judgment.
Record No. 071897 – Affirmed.

26