PRESENT: All the Justices

MARISSA R. SIMPSON, AN INFANT,
WHO SUES BY HER FATHER AND
NEXT FRIEND

OPINION BY
v.  Record No. 121984          JUSTICE DONALD W. LEMONS
                                    JANUARY 10, 2014
DAVID ROBERTS, ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
William D. Broadhurst, Judge

In this appeal we consider whether the Circuit Court of the
City of Roanoke ("trial court") erred when it held that Marissa
R. Simpson ("Simpson") was a patient of Dr. David Roberts ("Dr.
Roberts") and that her claim arose under Virginia's Medical
Malpractice Act, Code §§ 8.01-581.1 et seq. ("Act"), and was
subject to the Act's statutory cap on damages, Code § 8.01-
581.15.

I.  Facts and Proceedings Below

Simpson filed a motion for judgment in 2003, by her father
and next friend, Christopher Simpson, against Dr. Roberts, Dr.
J. Bradley Terry, and Southwest Virginia Physicians for Women,
Inc. (collectively referred to as the "defendants").[1]  Simpson
alleged that as a result of the defendants' negligence, she was
born with serious and permanent injuries.  In her motion for
judgment, Simpson asserted that her claims were common law

_____

[1] Simpson also sued Dr. Leslie E. Badillo and Carilion Healthcare
Corporation; however, those parties are not involved in this
appeal.

claims for medical malpractice because the treatment in question was not covered under the Act. Simpson demanded $10 million in damages.

The defendants filed a demurrer, arguing that the motion for judgment failed to state a cause of action for common law medical malpractice, failed to state why it was not covered by the Act, and that the ad damnum exceeded the statutory cap under the Act. A hearing on the demurrer was held on August 11, 2005, where Simpson clarified that she was only alleging her claim against Dr. Roberts was not covered by the cap. Simpson argued that at the time Dr. Roberts breached the standard of care, she was not a "natural person" because she had not yet been born, and therefore was not a "patient" as defined by the Act. She argued that because Dr. Roberts only treated her while she was in utero, he never had a doctor-patient relationship with her, and therefore she could bring a common law cause of action against him. Dr. Roberts argued that once Simpson was born alive, she became his patient and this claim was covered by the Act. The trial court sustained the demurrer and allowed Simpson to file an amended pleading.

Simpson filed an amended motion for judgment[2] asserting two alternative counts against the defendants: one for medical

---

[2] Simpson filed her amended motion for judgment on September 25, 2005, prior to the amendment of Part Three of the Rules of

2

malpractice under the Act, and one for common law medical malpractice against Dr. Roberts and his employer.  The defendants filed their responsive pleadings, including another demurrer to the common law claim.  However, the trial court never formally adjudicated this demurrer and the parties treated the claim as though the trial court's ruling on the demurrer was unchanged.  Simpson then filed a second amended complaint, adding a claim against another party who is not involved in this appeal.  The second amended complaint did not alter any of the allegations against Dr. Roberts and his employer.  The case proceeded to trial on the second amended complaint.

A multi-day jury trial was held in May 2012.  The evidence presented demonstrated that Simpson's mother, Marsha, was referred to Dr. Roberts by her family doctor during the third trimester of her pregnancy because she had developed gestational diabetes.  Dr. Roberts performed amniocentesis to determine whether Simpson's lungs were mature enough to induce early labor.  When Dr. Roberts performed the procedure, bleeding occurred.  Dr. Roberts then turned Marsha's care over to his partner, Dr. Terry, and was not involved in any further care of Marsha or Simpson.  Complications arose from the unsuccessful

Court, effective January 1, 2006, providing that "[a] civil action shall be commenced by filing a complaint in the clerk's office."  Rule 3:2(a).  Her second amended pleading, filed on May 30, 2006, was styled as a "Second Amended Complaint."

3

amniocentesis. Dr. Terry performed a caesarean section later that day to deliver Simpson. Simpson was born with damaged kidneys and cerebral palsy. The jury returned a $7 million verdict in Simpson's favor against Dr. Roberts, Dr. Terry, and Southwest Virginia Physicians for Women, Inc.

The defendants filed a motion to reduce the jury verdict pursuant to Virginia's statutory cap under the Act. Simpson filed an opposition to this motion and a motion asking the trial court to reconsider its previous ruling sustaining the defendants' demurrer on Simpson's common law cause of action against Dr. Roberts and Southwest Virginia Physicians for Women, Inc.[3]

The trial court held a hearing on the motion to reduce the verdict and heard argument from the parties. At the conclusion of the hearing, the trial court held that the cap applied. The trial court further held that Simpson was Dr. Roberts' patient, because at the time she was born alive, she became a "patient" under the Act. A final order was entered on August 21, 2012, awarding Simpson $1.4 million, the amount to which she was entitled under the cap.

Simpson timely filed her appeal to this Court, and we awarded her an appeal on the following assignments of error:

---

[3] Simpson agreed that the statutory cap applied to her verdict against Dr. Terry. Her argument that the cap does not apply is limited to Dr. Roberts and his employer.

4

1. The trial court erroneously ruled that the child was a patient of Dr. Roberts; and that her claim arose under the Medical Malpractice Act and was subject to the statutory cap on damages.

2. The trial court erroneously reduced the verdict based on the Medical Malpractice Act.

## II. Analysis

### A. Standard of Review

The issues whether Simpson is a patient within the meaning of the Act and whether the health care which was provided or should have been provided is covered by the Act are questions of statutory interpretation. Well-established principles guide our review of such questions. Issues of statutory interpretation are pure questions of law that this Court reviews de novo. Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007). When the language of a statute is unambiguous, we are bound by the plain meaning of that language. Id. We must give effect to the legislature's intention as expressed by the language unless a literal interpretation of the language would result in a manifest absurdity. Id. If a statute is subject to more than one interpretation, this Court must "apply the interpretation that will carry out the legislative intent behind the statute." Id.

### B. Legislative History

The origin of Virginia's Medical Malpractice Act is well-documented. In 1976, the General Assembly determined that the

increase in medical malpractice claims was directly affecting the cost and availability of medical malpractice insurance, and that without such insurance, health care providers could not be expected to continue providing medical care for the Commonwealth's citizens.  Etheridge v. Medical Center Hospitals, 237 Va. 87, 93, 376 S.E.2d 525, 527 (1989).  Because of this threat to medical care services, the General Assembly enacted the Virginia Medical Malpractice Act.  Id.

The General Assembly took the unusual step of including a preamble of the Act, in which it explained the need and reasons for the legislation.  We are aided in our understanding of legislative intent by the unusually explicit statement of legislative purpose in the preamble.  See Bulala v. Boyd, 239 Va. 218, 227, 389 S.E.2d 670, 674 (1990).  The preamble states:

> Whereas, the General Assembly has determined that it is becoming increasingly difficult for health care providers of the Commonwealth to obtain medical malpractice insurance with limits at affordable rates in excess of $750,000; and
>
> Whereas, the difficulty, cost and potential unavailability of such insurance has caused health care providers to cease providing services or to retire prematurely and has become a substantial impairment to health care providers entering into practice in the Commonwealth and reduces or will tend to reduce the number of young people interested in or willing to enter health care careers; and

Whereas, these factors constitute a significant problem adversely affecting the public health, safety and welfare which necessitates the imposition of a limitation on the liability of health care providers in tort actions commonly referred to as medical malpractice cases[.]

1976 Acts ch. 611.

One component of the Act is the statutory cap on damages in any verdict returned against a health care provider, which is set out in Code § 8.01-581.15. The purpose of the statutory cap is to provide a "security blanket" to health care providers and their insurers, to know what limits in coverage should be carried and to keep insurance available and affordable. Gen. Assem. J. Subcomm. Studying Virginia's Medical Malpractice Laws, Interim Report, H. Doc. No. 21, at 12 (1985). The General Assembly determined that the cap on recovery was an appropriate means of addressing the problem described in the preamble. Bulala, 239 Va. at 227-28, 389 S.E.2d at 675. It is clear that the intent of the legislature was to have the statutory cap apply "[i]n any verdict returned against a health care provider in an action for malpractice." Code § 8.01-581.15.

C. Definition of Patient/Application of Cap

There are several terms defined in the Act that are applicable to our analysis here. A "patient" is defined as:

[A]ny natural person who receives or should have received health care from a licensed health care provider except those persons

7

who are given health care in an emergency situation which exempts the health care provider from liability for his emergency services in accordance with § 8.01-225 or 44-146.23.

Code § 8.01-581.1.  Malpractice is defined as:

[A]ny tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient.

Id.  Health care is defined as:

[A]ny act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement.

Id.

Simpson argues that, at the time Dr. Roberts injured her, she was a fetus and therefore did not meet the definition of a "patient" because she was not yet a "natural person."  This Court has consistently followed the rule that a fetus is part of the mother, and injury to the fetus is injury to the mother.  If the fetus is never born alive, the fetus never develops a legal claim, but the mother may recover for the physical injury and mental suffering associated with a stillbirth.[4]  Modabar v. Kelley, 232 Va. 60, 66, 348 S.E.2d 233, 236-37 (1986).  However,

_____

[4] The amendments to Code § 8.01-50(B)&(C) effected by Acts 2012, ch. 725 were not in effect at the time this cause of action arose.

8

if the child is born alive, the child may bring a claim for the injury suffered in utero.

In Kalafut v. Gruver, 239 Va. 278, 283-84, 389 S.E.2d 681, 684 (1990), we held that "a tortfeasor who causes harm to an unborn child is subject to liability to the child, or to the child's estate, if the child is born alive." This is often referred to as the "conditional liability rule." Id. at 284, 389 S.E.2d at 684. We explained that

> the test is not, as defendant implies, whether the decedent could have maintained a personal injury action at the time of defendant's negligence or, stated differently, whether a fetus can maintain a tort action at the time it is injured in utero. Rather, the statutory test is whether, had death not ensued, the person could subsequently have maintained a personal injury action. Clearly, the answer to that question is in the affirmative in the case of a live birth.

Id. at 285, 389 S.E.2d at 684-85.

We applied this rule in the context of a medical malpractice action in the case of Bulala, 239 Va. 218, 389 S.E.2d 670, which was decided the same day as Kalafut. In Bulala, we considered whether a child, born alive, who was injured during labor, was a "patient" of the obstetrician who should have been present at her delivery. Id. at 229, 389 S.E.2d at 675-76. In Bulala, the defendant doctor failed to arrive at the hospital in a timely fashion to monitor the mother

9

during her labor and was not present for the delivery. The baby suffered asphyxia which caused severe birth defects. Id. at 223, 389 S.E.2 at 672. We held that the baby and the mother were each entitled to a separate cap under the Act because once the baby was born alive she became a "person" and met the definition of a "patient" under the Act. Id. at 229, 389 S.E.2d at 675-76. The baby was entitled to her own separate damages because at the moment of live birth, she became a patient who should have received care from the defendant doctor. Id.

In Castle v. Lester, 272 Va. 591, 636 S.E.2d 342 (2006), we reaffirmed our previous ruling in Bulala, holding that "when [a] defendant-doctor's negligence caused the child, though born alive, to be seriously impaired.... the mother and child were both 'patients' of the defendant, each of whom was entitled to a separate statutory damage cap under the Virginia Medical Malpractice Act." 272 Va. at 602, 636 S.E.2d at 347 (citation omitted).

Simpson attempts to distinguish her situation from that in Bulala by arguing that Dr. Roberts was never intended to deliver her or to provide her with health care at any point in her life. She contends that his only role was to conduct amniocentesis, which occurred before she was a person and a "patient" under the Act. The facts of the case and this Court's precedent, however, do not support Simpson's position.

10

As we stated in Kalafut, the test is not whether Simpson could have maintained a personal injury action at the time of Dr. Roberts' negligence or, stated differently, whether a fetus can maintain a tort action at the time an injury is suffered in utero. 239 Va. at 285, 389 S.E.2d at 684-85. Rather, the statutory test is whether, if death does not ensue, a person could subsequently have maintained a personal injury action. Id. In Kalafut and Bulala, our answer to that question was in the affirmative in the case of a live birth.

The evidence presented at trial was that the amniocentesis was performed, at least in part, for Simpson's benefit to determine whether her lungs were developed enough that she could be safely delivered. When Dr. Roberts performed this procedure, he was providing health care to Simpson and her mother. If Simpson had never been born alive, her mother would have been able to recover for the physical and emotional injuries associated with a stillbirth. However, once Simpson was born alive, she became a natural person under the Act. Upon birth, she became a patient of Dr. Roberts under the Act and had her own claim against Dr. Roberts. Under the Act, her claim for negligence included health care provided in utero consistent with the statutory definition. Our holding in Castle is applicable here: Dr. Roberts' negligence in performing the amniocentesis "caused the child, though born alive, to be

11

seriously impaired.... the mother and child were both 'patients' of the defendant, each of whom was entitled to a separate statutory damage cap under the Virginia Medical Malpractice Act." Castle, 272 Va. at 602, 636 S.E.2d at 347 (citation omitted).

Under this Court's holdings in Bulala, Castle, and Kalafut, Simpson became a "patient" when she was born alive. Having determined that Simpson became a patient, we look to the statutory definition of "health care" to determine whether her claim falls within the Act. The definition of "health care" is sufficient to encompass the medical services and procedures that Roberts provided or should have provided while Simpson was in utero. Interpreting this statute in any other manner would be contrary to the clear legislative intent expressed by the General Assembly to have the statutory cap apply "[i]n any verdict returned against a health care provider in an action for malpractice." Code § 8.01-581.15. "[E]very statute is to be read so as to promote the ability of the enactment to remedy the mischief at which it is directed." Bulala, 239 Va. at 227, 389 S.E.2d at 674 (citations and internal quotation marks omitted). Simpson's interpretation of the Act potentially would expose health care providers who treat pregnant women to unlimited liability. Such a result would be contrary to what the General

12

Assembly intended when it passed the Act, and we decline to accept her construction of the statute.

### III.  Conclusion

We will affirm the judgment of the trial court that Virginia's statutory cap on damages applies to Simpson's cause of action against the defendants in this case.

Affirmed.

JUSTICE McCLANAHAN, concurring.

I concur in the judgment of the Court because I agree the Act applies to Simpson's claim against Dr. Roberts.  However, I would hold that Simpson became a "patient" as defined by the Act when Dr. Roberts performed the amniocentesis – the date she received the alleged negligent treatment.

The Act's definitions of "patient" and "health care" focus on whether and when treatment is, or should have been, performed by a health care provider, not on when the patient has a cause of action – an entirely separate issue.  Specifically, the Act defines "patient" as "any natural person who receives or should have received health care from a licensed health care provider." Code § 8.01-581.1.  "Health care" is defined as treatment performed or which should have been performed "on behalf of a patient <u>during</u> the patient's medical diagnosis, care, treatment or confinement."  <u>Id.</u> (emphasis added).  Therefore, the Act

13

intends, and indeed assumes, that the physician-patient relationship exists when the treatment is, or should have been, rendered. This conclusion is compelled by basic principles governing the physician-patient relationship under which "[a] physician's duty arises only upon the creation of a physician-patient relationship." Didato v. Strehler, 262 Va. 617, 626, 554 S.E.2d 42, 47 (2001) (quoting Lyons v. Grether, 218 Va. 630, 633, 239 S.E.2d 103, 105 (1977)). There is no language in the Act indicating that the General Assembly intended its definition of "patient" to relate back to treatment rendered prior to the creation of the physician-patient relationship and, thus, prior to the existence of any duty.

Although the term "natural person" is not defined in the Act, I believe the General Assembly intended to include children in utero who are treated by a health care provider within the meaning of "patient" without regard to whether a cause of action may be brought by the child against such physician at the time treatment is rendered. Code § 8.01-2 defines "person" to "include individuals, a trust, an estate, a partnership, an association, an order, a corporation, or any other legal or commercial entity." Therefore, the definition of "patient" should properly be understood to mean natural human beings as distinguished from artificial entities.

14

Notably, in 2012, the General Assembly amended the wrongful death statute to recognize that an action may be brought against a tortfeasor for the wrongful death of a child in utero. Addressing actions for "fetal death" brought under the Virginia Medical Malpractice Act, the General Assembly stated that "where the wrongful act that resulted in a fetal death also resulted in the death of another fetus of the natural mother or in the death or injury of the natural mother, recovery for all damages sustained as a result of such wrongful act shall not exceed the limitations on the total amount recoverable for a single patient for any injury under § 8.01-581.15." 2012 Acts ch. 725 (enacting Code § 8.01-50(C)). Thus, in recognizing actions for fetal death under the Act, the General Assembly assumed that an unborn child was a "natural person" for purposes of the definition of "patient," without finding it necessary to amend the definition of "patient" under the Act.

Although the majority holds it is immaterial whether Simpson was a patient at the time she was treated by Dr. Roberts, our precedent leaves no doubt that the determination of whether a physician-patient relationship exists is made with reference to the time that treatment is, or should have been, rendered. For example, in Fruiterman v. Granata, 276 Va. 629, 668 S.E.2d 127 (2008), we required the father in a wrongful birth action to show the existence of a physician-patient

15

relationship at the time the treatment was, or should have been, rendered. As we stated, "[t]he question whether [the father] had a physician-patient relationship with [the physician], however, turns solely on the facts surrounding [the date health care was provided to the mother]." Id. at 644, 668 S.E.2d at 136. This was so based on the "language included at the end of the definition of 'health care,' referring to any act or treatment which should have been furnished 'during the patient's medical diagnosis, care, treatment or confinement.'" Id. at 643, 668 S.E.2d at 135. (quoting Code § 8.01-581.1) (emphasis in original). See also Gonzalez v. Fairfax Hosp. System, Inc., 239 Va. 307, 310, 389 S.E.2d 458, 459 (1990) (Plaintiff received "health care" within the meaning of the Act because "[t]he alleged negligent acts occurred while [plaintiff] was receiving treatment as a patient.") (emphasis added).

In Bulala v. Boyd, 239 Va. 218, 389 S.E.2d 670 (1976), this Court recognized the necessity of finding the existence of a physician-patient relationship when treatment was, or should have been, rendered. In determining whether the child in Bulala was entitled to the benefit of a separate cap, the Court held that the child was a patient and entitled to a separate cause of action "because she was a 'natural person' who, at the instant of birth, received or 'should have received' health care from defendant." 239 Va. at 229, 389 S.E.2d at 676. The Court's

holding was consistent not only with the Act's requirement that a physician-patient relationship exist when treatment is, or should have been, rendered, but also with the well-established principle that a physician's duty to a patient arises upon the creation of that relationship. See Code § 8.01-581.1; Didato, 262 Va. at 626, 554 S.E.2d at 47.

[1]

In my view, the majority improperly extrapolates into the definition of "patient" this Court's test for determining when a cause of action arises in tort for injuries to a child in utero. In Kalafut v. Gruver, 239 Va. 278, 283-86, 389 S.E.2d 681, 684-85 (1990), this Court recognized that a tortfeasor will be

---

[1] In Bulala, we were asked to determine whether the limitation of damages provided for in Code § 8.01-581.15 applied individually to the mother and her infant daughter or overall to both plaintiffs when the damages arose from the same act or acts of medical malpractice. See Bulala, 239 Va. at 222, 389 S.E.2d at 671-72. There was no dispute that the Act applied to the daughter's claim. Rather, the issue was whether the daughter was entitled to her own individual cap or whether her claim fell within the mother's statutory cap. In that context, we explained that "at the moment of live birth, the child became the patient of [Dr. Bulala]," the physician responsible for the delivery of the child. Id. at 229, 389 S.E.2d at 676. Because the child alleged negligence against Dr. Bulala arising from his failure to provide care at her birth, we were not asked, and indeed it was unnecessary, to determine whether an unborn child may be deemed a "patient" of a health care provider where the health care provider was not obligated to provide treatment at the time of birth. Rather, the disagreement in Bulala "existed . . . as to whom was a proper plaintiff," and not as to whether the child's claim alleged malpractice within the meaning of the Act in the first place. See Castle v. Lester, 272 Va. 591, 603, 636 S.E.2d 342, 348 (2006).

17

subject to liability for harm caused to an unborn child when that child is born alive.[2]  Applying the language of Virginia's wrongful death statute, the Court explained that under the language of the statute, the test is "whether, had death not ensued, the person could subsequently have maintained a personal injury action."  Id. at 285, 389 S.E.2d at 684-85.[3]  In adopting a cause of action for harm to unborn children, the Court stated that "we have drawn the line between nonliability and liability for prenatal injury at the moment of live birth of the child."  Id. at 284, 389 S.E.2d at 684.  The test adopted by the Court in Kalafut, while determinative of when a cause of action for prenatal injury will lie, has no bearing on whether a child in

_____

[2] Despite recognizing a cause of action for injuries to unborn children who are born alive, the Court nevertheless refused to abandon its view that "in tort litigation . . . an unborn child is a part of the mother until birth."  Modaber v. Kelley, 232 Va. 60, 66, 348 S.E.2d 233, 236-37 (1986); see Kalafut, 239 Va. at 284-85, 389 S.E.2d at 684-85.  The Court's retention of this view, however, did not vitiate the duty owed by a tortfeasor to a child in utero, the breach of which may give rise to a cause of action in tort.  Likewise, it did not vitiate the duty owed by a physician to a child in utero, the breach of which may give rise to a cause of action for medical malpractice. Instead, the duty owed by a physician to a child in utero is based on whether a physician-patient relationship has been created and cannot arise absent the existence of such relationship.

[3] The wrongful death statute now provides a cause of action for the wrongful death of a child in utero.  See Code § 8.01-50(B), added by 2012 Acts ch. 725.

18

utero is a "patient" under the Virginia Medical Malpractice Act.[4]

Furthermore, there is no language in the Act that would evidence

an intent by the General Assembly that this Court's evolving

treatment of the legal status of a child in utero should be

incorporated into its definitions of "patient" and "health

care," both of which focus on <u>whether</u> and <u>when</u> treatment is, or

should have been, rendered, not on when the patient has a cause

of action for negligent treatment.

For these reasons, I would hold that Simpson became a

"patient" of Dr. Roberts when he performed the amniocentesis.

At that time, the physician-patient relationship was created,

which in turn, gave rise to Dr. Roberts' duty.  Therefore, the

Act and its statutory cap on damages applied to Simpson's claim.

Accordingly, while I depart from the majority's rationale, I

concur with the Court's decision to affirm the judgment of the

trial court.

---

[4] The majority relies upon <u>Bulala</u> for the proposition that the
Act's definition of "patient" depends on when a cause of action
exists.  As stated previously, the issue in <u>Bulala</u> was whether
the child was entitled to a separate cause of action and
statutory cap on damages.  Because she alleged negligent
treatment at her birth, the Court was necessarily focused on her
status as a patient at birth.  To the extent the Court
incorporated into the definition of "patient" the test it
adopted in <u>Kalafut</u> for determining when a cause of action exists
for prenatal injury, I believe <u>Bulala</u> should be clarified.